Constance WELLS, Plaintiff–Appellant,

v.

Patrick O'MALLEY; Daniel Gallagher; Samir Mohammad; Kenneth Dowell; William Newsome; Cuyahoga County, Defendants–Appellees.

No. 03–3070.

United States Court of Appeals, Sixth Circuit.

July 21, 2004.

Steven D. Shafron, B. Jessie Hill, Berkman, Gordon, Murray & DeVan, Cleveland, OH, for Plaintiff-Appellant.

Carmen Naso, Steven W. Ritz, Asst. Pros. Attorney, Cuyahoga County Prosecutor's Office, Cleveland, OH, for Defendants-Appellees.

Before BOGGS, Chief Judge; NELSON and SUTTON, Circuit Judges.

SUTTON, Circuit Judge.

In this § 1983 action, Constance Wells alleges that Cuyahoga County Recorder Patrick O'Malley and several other defendants violated her First (and Fourteenth) Amendment rights by demoting her and constructively discharging her in retaliation for engaging in union activity. After Wells presented her case to a jury, the defendants moved for judgment as a matter of law under Rule 50(a) of the Federal Rules of Civil Procedure. The district court granted the motion, and we affirm.

I.

In April 1997, Constance Wells began working for the Recorder's Office of Cuyahoga County, Ohio. One of the first employees hired by the new Recorder, Patrick O'Malley, Wells started as an administrative assistant on O'Malley's transition team and joined his front office staff later that year as a member of the payroll department.

In 1998, Wells accepted a position in the office's computer department. She filled the newly-created PC Specialist position, which was responsible for training the office staff (about 90 employees) on Windows 95 as well as on the new Landtrak computer system, a database program used for indexing documents in the office. By November 1999, the new computer system was up and running, and the staff had been trained on it.

During the initial years of O'Malley's tenure in the Recorder's Office, a local union initiated an organizing campaign at the office. When Wells became the office's PC Specialist in 1998, she joined the union. And in September 1999, O'Malley recognized the union as the bargaining unit's representative.

Soon after, the union conducted two meetings with employees of the Recorder's Office, one in October 1999, the other in November 1999. Wells attended both meetings, where she spoke favorably of the union's activities and criticized the office for creating an environment in which salaries and pay raises seemed to turn on political involvement rather than merit. After the meetings, two senior members of the office, William Newsome (title company liaison and labor relations advisor) and Kenneth Dowell (director of operations), questioned employees about what had happened at the meetings.

Following the November meeting, senior members of the administration learned that a document containing confidential employee information—including names, job titles, salaries, medical coverage and race—had been created in breach of the office computer system's security, and that the document had been circulated to union members at the meeting and within the office. After reviewing the document, defendants Dowell, Mohammad and Dan Gallagher (the Chief of Staff) met with employee Shane Graves, who acknowledged that the document had been distributed at the November union meeting.

On December 1, 1999, when O'Malley returned from a vacation in Ireland, he learned of the security breach. Anise Marshall, an employee who had attended the November union meeting, informed O'Malley that Wells and another employee, Dave Nottingham, had distributed the document at the meeting. Nottingham was called in for questioning but refused to comment about the document.

Mohammad investigated the hard drives of the computer department's employees and found the document on the computer of employee Truman Eng. After being confronted with the information, Eng resigned the following morning, December 2nd.

That same day, O'Malley decided to transfer Wells out of the computer department to a position in the data entry department, where she would receive the same pay. When Wells learned of the transfer, she became visibly upset, and instead of going to data entry she "threw things into a box," JA 191, grabbed her coat, turned in her parking pass and left the building. Later that day, Wells called the office's payroll finance director to seek permission to take the rest of the day as a sick day. In response, she was told, "You resigned." JA 195. On December 3rd, Wells returned to the office and again was told that she had resigned.

On February 9, 2000, Wells filed this lawsuit. She claimed that the transfer to data entry was a demotion and constructive discharge in retaliation for her union activity. She also raised a conspiracy claim and several state-law claims. While the district court granted summary judgment to the defendants on some of the claims, it declined to find qualified immunity on the retaliation claim, determining

that genuine issues of material fact remained regarding the defendants' grounds for transferring Wells. On appeal, this Court affirmed the district court's qualified-immunity ruling. *Wells v. O'Malley,* 31 Fed.Appx. 886 (6th Cir.2002).

On remand, the district court held a jury trial regarding Wells' claims. After Wells presented her case, the defendants moved for judgment as a matter of law under Rule 50(a) of the Federal Rules of Civil Procedure, contending that Wells had failed as a matter of law to show that the defendants transferred her from PC Specialist to data entry clerk in substantial part because of her union activity. The district court granted the motion and entered judgment for the defendants.

## II.

We review de novo a district court's decision to grant a Rule 50 motion for judgment as a matter of law. *Hamad v. Woodcrest Condominium Ass'n,* 328 F.3d 224, 236 (6th Cir.2003). A Rule 50 motion may be granted when, after viewing the evidence in the light most favorable to the nonmoving party, "there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue." Fed.R.Civ.P. 50(a).

"[T]he decision to grant judgment as a matter of law or to take the case away from the jury is appropriate whenever there is a complete absence of pleading or proof on an issue material to the cause of action or when no disputed issues of fact exist such that reasonable minds would not differ." *Hall v. Consol. Freightways Corp.,* 337 F.3d 669, 672 (6th Cir.2003) (quotation omitted). Whether judgment as a matter of law is appropriate in the employment context depends on a number of factors, including the "strength of the plaintiff's prima facie case, the probative value of the proof that the employer's ex-

planation is false, and any other evidence that supports the employer's case and that properly may be considered on a motion for judgment as a matter of law." *Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 148—49, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000).

## A.

■ Wells contends that because she survived the defendants' summary—judgment motion, it follows that she should have survived the defendants' Rule 50(a) motion. But the one decision does not bind a district court in ruling on the other motion. When a district court (or a court of appeals) denies a summary judgment motion, the ruling does not bind the district court when it is later called upon to decide a Rule 50 motion. *See Regal Cinemas, Inc. v. W & M Props.,* 90 Fed.Appx. 824, 829 (6th Cir.2004) ("A district court is simply not bound by a denial of summary judgment, whether it be its own or ours, on the ultimate issue of whether a Rule 50 motion should be granted."); *Welker v. Goodyear Tire Co.,* No. 96–3045, 1997 WL 369450, 1997 U.S.App. LEXIS 16392, at *8—9 (6th Cir. July 1, 1997) ("The district court is simply not bound by its pretrial denial of a summary judgment after it actually considers the evidence ultimately presented at trial."); *see also Abel v. Dubberly,* 210 F.3d 1334, 1337 (11th Cir.2000) (consideration of Rule 50 motion after denial of summary judgment expressly permitted); *St. Louis Convention & Visitors Comm'n v. Nat'l Football League,* 154 F.3d 851, 860 (8th Cir.1998) ("The court's prior decision on summary judgment did not control the outcome of the Rule 50 motion."). The reason is straightforward. Summary-judgment rulings are anticipatory, and plaintiffs and trial courts occasionally err on the side of expecting that more (rather than less) evidence will be present-

ed in support of a claim. *See Pinney Dock & Transport Co. v. Penn Cent. Corp.*, 838 F.2d 1445, 1472 (6th Cir.1988) ("[A]lthough the movant may [ ] technically" be entitled to summary judgment, "[t]he trial court may [ ] exercise [ ] sound discretion in denying [it] where [ ] the court is not reasonably certain there is no triable issue of fact."). There is nothing anticipatory about a Rule 50 motion: either the plaintiff has produced evidence supporting the claim or she has not. When she has not, a district court quite permissibly may decide that the issue should not go to a jury even though it earlier denied a motion for summary judgment under Rule 56. *See Braniff v. Jackson Ave.-Gretna Ferry, Inc.*, 280 F.2d 523, 529 (5th Cir.1960) ("[T]he reversal of summary judgment does not foreclose the right and the imperative duty of the District Judge to test the case against the actual evidence adduced at every stage of the trial. Nor is it a forecast that on remand the case must go to the jury."); *cf.* Fed.R.Civ.P. 50 advisory committee's note (1991 amends.) ("The revision authorizes the court to perform its duty to enter judgment as a matter of law at any time during the trial, as soon as it is apparent that either party is unable to carry a burden of proof that is essential to that party's case. Thus, the second sentence of paragraph (a)(1) authorizes the court to consider a motion for judgment as a matter of law as soon as a party has completed a presentation on a fact essential to that party's case. Such early action is appropriate when economy and expedition will be served.").

### B.

■ Even if the district court's summary-judgment ruling did not have preclusive effect, Wells argues that she presented sufficient evidence to take her retaliation claim to a jury. To establish a prima facie claim of retaliation under the First and Fourteenth Amendments, Wells had the burden of producing evidence from which a jury could reasonably conclude that: (1) she was engaged in activity protected by the First Amendment; (2) the defendants committed an adverse action against her; and (3) the adverse action was motivated in substantial part by her constitutionally-protected activity. *Mattox v. City of Forest Park*, 183 F.3d 515, 520 (6th Cir. 1999).

Wells has satisfied the first two prongs of this claim. As the defendants conceded in their appellate brief, Wells was engaged in union activity, and the First Amendment protects that form of expression and association. *See Smith v. Ark. State Highway Employees*, 441 U.S. 463, 464, 99 S.Ct. 1826, 60 L.Ed.2d 360 (1979); *Boals v. Gray*, 775 F.2d 686, 693 (6th Cir.1985) ("We have no doubt that an employee who is disciplined solely in retaliation for his membership in and support of a union states a valid first amendment claim."). And as the defendants conceded at oral argument, a jury reasonably could conclude that the job transfer in this instance amounted to an adverse employment action. *See Thaddeus–X v. Blatter*, 175 F.3d 378, 396 (6th Cir.1999) (en banc) (listing "discharge, demotions, refusal to hire, non-renewal of contracts, and failure to promote" as examples of adverse actions in employment).

The debatable point "is whether the adverse action taken against plaintiff[ ] by defendants was motivated in substantial part by the protected activity of the plaintiff[ ]." *Mattox*, 183 F.3d at 520—21. The district court concluded that Wells failed to present adequate evidence to support a finding by the jury that defendants transferred Wells for improper reasons, a conclusion with which we agree.

The record as an initial matter contains several permissible reasons for the transfer. Eight months before the transfer, Wells' supervisor, Mohammed, suggested to O'Malley that he should transfer Wells out of the computer department because the need for a computer specialist position had diminished after the new Landtrak computer system was installed and after the office staff had been trained in running it. Wells does not dispute that Mohammed made this recommendation, does not dispute that the computer specialist position became less necessary after the Landtrak system was installed and does not claim that her position was filled after the transfer.

Nor is there any dispute about the core facts of the computer-security breach that immediately preceded the transfer. Wells does not deny that a computer-security breach occurred and indeed acknowledges seeing the offending document at the November union meeting. Neither does she deny that the breach required a response from the Recorder's Office.

The undisputed evidence also shows that, upon returning from his vacation, O'Malley was informed of the security breach and immediately conducted an investigation "to get to the bottom of it." JA 149. The investigation showed that the document was on the computer of Truman Eng, a member of the computer department who resigned on the day he was confronted with this information. Others stated that they saw Wells and Nottingham distribute the document at the union meeting. The question under these circumstances is not whether Wells in fact improperly obtained the document or in fact distributed it at the November union meeting, both of which she denies. The question is whether O'Malley's office conducted an investigation of the computer-security breach and determined that Wells

was involved in it. *See Smith v. Chrysler Corp.*, 155 F.3d 799, 807 (6th Cir.1998) (noting that when assessing an employer's adverse employment action, "the key inquiry is whether the employer made a reasonably informed and considered decision before taking [it]"); *Kinamore v. EPB Elec. Util.*, 92 Fed.Appx. 197, 204 (6th Cir.2004) ("At no point has Kinamore offered any explanation why O'Haver could not fairly rely upon Pierce's investigation—and Lansden's first-hand observations—to draw the conclusion he did."). Because the office conducted an investigation and because the investigation showed that Wells (in the investigators' eyes) was involved in the document's distribution, the defendants presented non-retaliatory grounds for transferring Wells from the computer department to a department unrelated to the security breach.

■ Wells counters that the "specious nature" of the explanations for the transfer shows pretext. Wells Br. at 30; *see Reeves*, 530 U.S. at 143, 120 S.Ct. 2097 ("[T]he plaintiff—once the employer produces sufficient evidence to support a nondiscriminatory explanation for its decision—must be afforded the 'opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination.'") (quoting *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981)). She initially raises suspicions about the need for a new data entry employee given that O'Malley acknowledged creating the opening on the morning of her transfer. But the defendants do not claim that Wells' transfer was legitimate because the office needed to fill the data entry position; they claim that the transfer was legitimate because the office needed to move Wells out of the computer department, where a security

breach (with which Wells appeared to have had some involvement) took place. The decisions to transfer another individual in order to make room for Wells and to make both transfers immediately are consistent with the defendants' non-retaliatory explanations for their actions.

Wells next contends that Mohammad's statement that he advised O'Malley to transfer her eight months earlier cannot be reconciled with Dowell's statement that O'Malley gave him an urgent directive to transfer Wells on December 2nd. In view of (1) the unchallenged seriousness of the security investigation, (2) the fact that Wells was shown to be involved in distributing the document and (3) the fact that Wells was in the computer department, O'Malley's reliance on an assessment of the dispensability of the PC Specialist position *after* the security breach does not establish pretext.

Wells next claims that O'Malley's treatment of two other employees shows pretext. O'Malley promoted Mary Dunlap to an assistant supervisor position, Wells points out, in response to Dunlap's overt pro-union activity. But the suggestion that an employer's *promotion* of one union activist establishes a retaliatory motive toward another union activist does not command immediate respect. At all events, Wells has offered nothing more than speculation that Dunlap's promotion was undeserved and indeed acknowledged at trial that Dunlap's promotion might not have been union-related at all.

■ Wells next points to the defendants' treatment of Dave Nottingham—the other employee linked to the distribution of the document at the union meeting—who "practically admitted that he knew the document's origin but glibly refused to be 'a snitch.'" Wells Br. at 31. That Nottingham was never disciplined, she argues, reveals that O'Malley did not take the security breach seriously and demonstrates bias against her union activity. That Nottingham allegedly was doing the same thing at the union meeting—distributing the controversial document—and that the office did not transfer him, however, does not establish anti-union animus. If anything, this evidence suggests that something else—besides union involvement—motivated the office in transferring Wells. More critically, Wells does not establish that she and Nottingham were similarly situated. In particular, she does not argue that Nottingham was in the computer department and (like her) should have been transferred for that reason.

■ Wells next contends that the temporal proximity between the November union meeting and the transfer—just over two weeks—by itself establishes that the defendants' explanations for the transfer are pretextual. "But such temporal proximity is insufficient in and of itself to establish that the employer's [nonretaliatory] reason for [demoting] an employee was in fact pretextual." *Skrjanc v. Great Lakes Power Serv. Co.*, 272 F.3d 309, 317 (6th Cir.2001). In this case, not only were there compelling explanations for the transfer, but the transfer was closer in time to the information that Wells was distributing a stolen document (November 15, 1999) than it was to the information that Wells was participating in union activities (October 12, 1999). And of course Wells' transfer was closest in time to O'Malley's return from vacation and the results of the investigation he initiated. Under these circumstances, the timing of the transfer decision by itself does not provide sufficient evidence to present this claim to a jury.

## C.

Wells finally contends that the district court erred in rejecting her punitive-dam-

ages claim as a matter of law. "[A] jury may be permitted to assess punitive damages in an action under § 1983 when the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others." *Smith v. Wade*, 461 U.S. 30, 56, 103 S.Ct. 1625, 75 L.Ed.2d 632 (1983); *see Ivey v. Wilson*, 832 F.2d 950, 958 (6th Cir.1987). Because Wells' underlying constitutional claim fails as a matter of law, it follows that she does not have a cognizable punitive-damages claim under § 1983.

## III.

For the foregoing reasons, we affirm.