**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 07a0486n.06
Filed: July 9, 2007

No. 06-1904

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

| | | |
|---|---|---|
| CHRISTOPHER VAN COMPERNOLLE, | ) | |
| | ) | |
| Plaintiff-Appellant, | ) | |
| | ) | |
| v. | ) | ON APPEAL FROM THE UNITED |
| | ) | STATES DISTRICT COURT FOR THE |
| CITY OF ZEELAND and CHIEF WILLIAM | ) | WESTERN DISTRICT OF MICHIGAN |
| OLNEY, individually and in his Official | ) | |
| Capacity as Chief of the Police Department of | ) | |
| the City of Zeeland, and City Manager, | ) | |
| TIMOTHY KLUNDER, individually and in his | ) | |
| Official Capacity as Manager of the City of | ) | |
| Zeeland, | ) | |
| | ) | |
| Defendants-Appellees. | ) | |
| _____ | ) | OPINION |

**Before: SILER and GILMAN, Circuit Judges; ZATKOFF, District Judge.**[*]

**ZATKOFF, District Judge**. Christopher Van Compernolle (Van Compernolle), a former

police officer with the City of Zeeland, Michigan, appeals the district court's decision granting

Defendants-Appellants' (Defendants) motion for summary judgment on Van Compernolle's claim

that his discharge was in retaliation for engaging in union-related speech protected by the First

_____

[*] The Honorable Lawrence P. Zatkoff, United States District Judge for the Eastern
District of Michigan, sitting by designation.

Amendment.  For the reasons set forth herein, we affirm.

I.

A.

Officer Christopher Van Compernolle began working for the City of Zeeland in 1991. By all accounts Van Compernolle was an excellent patrol officer, generally making more arrests than the other officers.  Van Compernolle's high arrest totals required him to make numerous court appearances that resulted in many hours of overtime.  Rather than being paid overtime wages, Van Compernolle chose to bank his overtime hours as compensatory time (comp time).  Pursuant to the union contract, officers could bank up to fifty hours of comp time during the year.  When an officer elected to use some of the hours the bank would decrease accordingly, but could later be raised back up to fifty hours.  At the end of its fiscal year, Zeeland paid any remaining comp time hours as overtime wages.

In addition to his police duties, Van Compernolle was active with his union and served as union president.  During his time with the department Van Compernolle had earned the respect of his fellow officers and they generally viewed him as their de facto leader.  In his capacity as union president, Van Compernolle worked with his supervisors and other city officials on union-related matters including comp time, retirement benefits, vacation time, and personal grievances.  In 2001, Van Compernolle also opened a salt-water aquarium business in Zeeland.

During the relevant time period, Zeeland's police department consisted of seven full-time

police officers, three or four part-time officers, a sergeant, and a chief. As a small department, the officers were responsible for keeping track of their work hours on biweekly time sheets. Supervisors would review the time sheets before sending them to Zeeland's finance department. The officers would often submit their time sheets for review on the same morning they were due in the finance department, leaving only a few hours for the supervisors to review them.

The City hired William Olney as its Chief of Police in May 2001. Prior to accepting his position with Zeeland, Chief Olney spent twenty-five years as a trooper with the Michigan State Police. As a trooper Chief Olney, like Van Compernolle, was active in his union. As Chief of Police, Olney's duties, in addition to supervising and managing the department, included reviewing biweekly time sheets, officers' work logs, and scheduling officers' shifts. Chief Olney also addressed union grievances that individual officers had with various employment issues.

Chief Olney provided his input on department operations during the City's negotiations with the officers' union in 2002. The main issues during those negotiations, in which Van Compernolle also participated, concerned increasing wages and lowering the officers' retirement age. These issues were not resolved during the negotiations, but were settled prior to arbitration in 2003. Additionally, the union proposed an increase to the amount of comp time an officer could bank in one year from fifty hours to eighty hours. The city made a counter-offer to increase the cap to sixty hours per year. In the Chief's opinion, comp time was more difficult from a management perspective than simply paying overtime wages. When an officer used comp time, it required supervisors at the department to rearrange schedules and sometimes struggle to find officers to fill

shifts. Although he would not eliminate comp time completely, Chief Olney felt it should be limited because overtime pay was a more effective use of the department's funds.

On March 25, 2002, Van Compernolle was disciplined for submitting inaccurate time sheets on four occasions between September 16, 2001, and January 30, 2002. These inaccuracies resulted in Van Compernolle being compensated for twenty-eight hours of work when he in fact did not work these hours. The Chief identified three department rules of general conduct that applied to Van Compernolle's situation: (1) rule 1.20 False Statements or Records, a fourth-level offense; (2) rule 1.38 Neglect of Duty, a third-level offense; and (3) rule 2.3 False Reports, a fifth-level offense.[1] Chief Olney elected rule 1.38 Neglect of Duty as the applicable violation, which was the least severe alternative. Although the department's rules mandated a four-day suspension for a first-time third-level offense, the Chief required Van Compernolle to serve only one day of the four-day suspension and held the remaining three days in abeyance for two years on the condition that Van Compernolle not commit any similar violations in that period. Van Compernolle agreed to the conditions of the Chief's disciplinary action and did not contest the fact of the violations.

Prior to the expiration of the two-year abeyance period, Van Compernolle submitted another inaccurate time sheet. The payroll records for the pay period ending March 20, 2004, indicated that

---

[1]The penalty for a third-level offense, first violation, was a five day suspension with an eight hour day or a four day suspension with a ten or twelve hour day. *See* JA at 659. The penalty for a fourth-level offense, first violation, was a ten day suspension with an eight hour day or an eight day suspension with a ten or twelve hour day. *See id.* The penalty for a fifth-level offense, first violation, was dismissal. *See id.*

Van Compernolle requested to use twelve hours of comp time but still reported working that day on his time sheet, resulting in his being credited for twelve hours worked without deducting any comp time. In a memo dated April 26, 2004, the Chief pointed out that this constituted Van Compernolle's second third-level offense, which carried a penalty of an eight-day suspension. Further, the Chief reminded Van Compernolle that he had received a warning in November 2003 regarding another discrepancy in his pay sheet. Instead of requiring Van Compernolle to serve his three-day suspension from his first offense and the eight-day suspension from his second offense, Chief Olney offered to allow Van Compernolle to serve the eight-day suspension by forfeiting eighty hours of comp time. Van Compernolle agreed. The Chief also warned Van Compernolle that he expected accuracy in all work-related reports, especially where there was previous discipline, and that further violations could result in termination from the department. In addition, Van Compernolle received a written warning for reporting late for duty, a second-level offense.

On the same day as Van Compernolle's second discipline, the department posted a notice that it would be accepting applications for a newly created Corporal position. Although Van Compernolle was the only officer to apply, Chief Olney did not select him for the position. The Chief felt that it would be inappropriate to reward Van Compernolle with a promotion in light of his recent discipline. When he learned that he would not be promoted, Van Compernolle filed a grievance with the union on July 1, 2004, that was ultimately denied.

Finally, while reviewing the time sheets for the pay period ending July 10, 2004, Chief Olney discovered that Van Compernolle carried twelve hours of work on June 28, 2004, when he had in

fact called in sick. Chief Olney did not immediately bring this discrepancy to Van Compernolle's attention, but provided Van Compernolle with an updated sick leave balance sheet hoping that he would notice the error and correct it himself. The department regularly provided officers with updated balance sheets each time an officer used sick time. According to Van Compernolle, he did not understand why he had been given the balance sheet and as of August 9, 2004, had not corrected his mistake. On that date, Chief Olney informed Van Compernolle of his error and scheduled an interview to discuss the matter with Van Compernolle and a union representative the next day. At the interview, Van Compernolle admitted that he submitted an inaccurate time sheet and acknowledged that he had been disciplined twice for similar violations.

Following the meeting, the City investigated Van Compernolle's inaccurate time sheets as well as those of other officers. The City concluded that the inaccuracies in Van Compernolle's time sheets were of a different nature than those contained in other officers' time sheets in that Van Compernolle reported working hours that he did not work, which always inured to his benefit. Thereafter, Chief Olney made the decision to dismiss Van Compernolle. City Manager Klunder agreed with the Chief's decision and formally notified Van Compernolle of his termination on August 24, 2004.

## B.

On February 18, 2005, Van Compernolle filed a five-count complaint alleging discrimination

based on a disability, intentional infliction of emotional distress,[2] loss of consortium, and a violation of his First Amendment rights. Defendants filed a motion for summary judgment on all counts and Defendants Olney and Klunder asserted a defense of qualified immunity.

On May 24, 2006, the district court issued a detailed opinion granting Defendants' motion for summary judgment. The district court concluded that Van Compernolle failed to establish a genuine issue of material fact as to whether he was discharged solely by reason of his disability. As for Van Compernolle's First Amendment claim, the district court concluded that his union activity and speech did not amount to protected speech because Van Compernolle's point was to address internal, personal disputes that were not matters of public concern. The district court also found that even if Van Compernolle's speech was protected, he had failed to raise a genuine issue of material fact as to whether Defendants' conduct was motivated by Van Compernolle's protected activity. The district court did not reach the issue of qualified immunity, nor did it address the claim for loss of consortium.

Van Compernolle now appeals the judgment of the district court with respect to his First Amendment retaliation claim. Van Compernolle does not appeal the district court's ruling on his disability discrimination claim.

## II.

We review the grant of summary judgment *de novo*. *Turner v. City of Taylor*, 412 F.3d 629,

---

[2]Van Compernolle abandoned this claim in his response to Defendants' Motion for Summary Judgment.

637 (6th Cir. 2005). Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c); *accord Turner*, 412 F.3d at 637. When deciding a motion for summary judgment, the court must view the evidence and draw all reasonable inferences in favor of the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The "mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). A genuine issue of material fact exists when there is "sufficient evidence favoring the non-moving party for a jury to return a verdict for that party." *Id.* at 249 (citations omitted). "If the evidence is merely colorable or is not significantly probative, summary judgment may be granted." *Id.* at 249-50 (citations omitted).

III.

A.

A prima facie case of First Amendment retaliation pursuant to 42 U.S.C. § 1983 requires the plaintiff to demonstrate that (1) he engaged in constitutionally protected activity, (2) defendants' adverse action caused him to suffer an injury that would likely chill a person of ordinary firmness from continuing to engage in the activity, and (3) the adverse action was motivated, at least in part, as a response to his exercise of his constitutional rights. *Farhat v. Jopke*, 370 F.3d 580, 588 (6th Cir.

2004). Where the plaintiff is a government employee, he must also demonstrate that his speech touched on matters of public concern, and that his "interest in commenting upon matters of public concern ... outweigh[ed] the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." *Cockrel v. Shelby County School Dist.*, 270 F.3d 1036, 1048 (6th Cir. 2001). The purpose of the latter two showings is to strike a proper balance between the employee's right, as a citizen, to comment on matters of public concern and the government's legitimate interest, as an employer, in regulating the speech of its employees as a means of efficiently providing public services through its employees. *Connick v. Myers*, 461 U.S. 138, 142 (1983); *Pickering v. Board of Education*, 391 U.S. 563, 568 (1968).

The Supreme Court has set forth a three-step inquiry in order to determine if a public employer violates the First Amendment by firing a public employee for engaging in speech or association. *See Connick*, 461 U.S. at 143. The court must first determine whether the speech addresses a matter of public concern. *Cockrel*, 270 F.3d at 1048. If so, the court must balance the employee's interests "as a citizen, in commenting upon matters of public concern and the interest of the state, as an employer, in promoting the efficiency of the public services it performs through its employees." *Pickering*, 391 U.S. at 568. Finally, if the balance favors the employee, the court must ask whether the employee's speech or association was a substantial or motivating factor in the employer's decision to take adverse employment action. *Mt. Healthy City Sch. Dist. Bd. of Ed. v. Doyle*, 429 U.S. 274, 287 (1977).

The threshold issue is whether the employee's speech addressed a matter of public concern,

which is a matter of law for the court to decide. *Garcetti v. Ceballos*, 126 S. Ct. 1951, 1958 (2006);

*Brandenburg v. Housing Authority of Irvine*, 253 F.3d 891, 897 (6th Cir. 2003). If the employee's

speech does not address a matter of public concern, there is no need to balance his interest in speech

with the employer's interest in efficiency, and the employee's claim must fail. *Garcetti*, 126 S. Ct.

at 1958. Matters of public concern are those that can "be fairly considered as relating to any matter

of political, social, or other concern to the community[.]" *Connick*, 461 U.S. at 146. "Whether an

employee's speech addresses a matter of public concern must be determined by the content, form,

and context of a given statement, as revealed by the whole record." *Id.* at 147-48.

This Court has stated that "speech is of 'public concern' if it involves issues about which

information is needed or appropriate to enable the members of society to make informed decisions

about the operation of their government." *Farhat*, 370 F.3d at 590 (citing *Rodgers v. Banks*, 344

F.3d 587, 596 (6th Cir. 2003)). "Such matters of public concern are to be contrasted with internal

personnel disputes or complaints about an employer's performance." *Brandenburg*, 253 F.3d at 898.

Yet, "[t]he fact that the public employee engages in the speech while in the course of his or her

employment does not preclude a finding that the speech touches upon a matter of public concern."[3]

*Farhat*, 370 F.3d at 590. Further, the employee's motive for speaking is relevant to the analysis but

---

[3]In *Garcetti*, the Supreme Court recently held that when an employee speaks pursuant to his official duties, he is not speaking as a citizen, and the Constitution does not insulate him from employer discipline. *Garcetti*, 126 S. Ct. at 1960. *Garcetti's* holding dealt only with speech that is required as part of the employee's duties as opposed to speech in the course of employment generally, and is thus consistent with our cases holding that speech in the course of employment may be entitled to First Amendment protection.

is not dispositive. *Id.* at 590-91. More significant than why the employee spoke is what the employee intended to communicate by speaking. *See id.* at 591-92. Based on these principles we must examine: "the focus of the speech; the point of the speech in question; to what purpose the employee spoke; the intent of the speech; or the communicative purpose of the speaker." *Id.* at 592 (internal quotation marks omitted). Finally, as a "corollary" to the focus test, "the proper inquiry is *not* what might be 'incidentally conveyed' by the speech, and that 'passing' or 'fleeting' references to an arguably public matter do not elevate the speech to a matter of 'public concern' where the 'focus' or 'point' of the speech advances only a private interest." *Id.* at 592-93.

B.

Van Compernolle argues that he was retaliated against because he assisted other officers with their grievances and often spoke with management regarding employment issues. Van Compernolle further argues that the very fact that his speech gave officers a voice in their employment made his activities matters of public concern. The district court concluded that Van Compernolle's speech under these circumstances did not touch on matters of public concern. We agree.

"Federal courts normally do not review personnel decisions reacting to an employee's behavior 'when a public employee speaks not as a citizen upon matters of public concern, but instead as an employee upon matters of only personal interest.'" *Jackson v. Leighton*, 168 F.3d 903, 909-10 (6th Cir. 1999) (quoting *Connick*, 461 U.S. at 147). While the fact that the speech occurred during the course of employment does not preclude it from being a matter of public concern, it is clear that internal grievances that are purely personal in nature are not matters of public concern.

*Brandenburg*, 253 F.3d at 898 (finding that speech "does not touch on a matter of public concern, as that requirement has been interpreted, where its aim is to air or remedy grievances of a purely personal nature").

Van Compernolle's participation in other officers' grievance procedures was not a matter of public concern. These grievances related to employee discipline, which is generally not a matter of public concern. *See Cockrel*, 270 F.3d at 1052 (finding that "an employee grievance or some other private dispute generally does not constitute a matter of public concern"); *Jackson*, 168 F.3d at 910-11 (finding internal personal grievances constitute the "quintessential employee beef" of incompetent management). Van Compernolle has not provided any evidence of the purpose, content, or intent of his speech made during these proceedings and none of the officers deposed in this action identified any particular speech or activity on the part of Van Compernolle other than their general belief that he was a vocal union member. In the absence of any evidence that Van Compernolle's union-related activity on behalf of other officers encompassed more than internal personnel issues the record does not show that Van Compernolle's activity focused on issues about which information is needed or appropriate to enable the members of society to make informed decisions about the operation of their government. *See Kraemer v. Luttrell*, 189 Fed. Appx. 361, 367 (6th Cir. 2006) ("Whether the filing of a grievance is protected depends on the content of the grievance because public employees' speech is protected from retaliatory conduct primarily when the speech relates to a matter of public concern"). Likewise, the fact that these issues were shared by officers other than Van Compernolle does not mean they are matters of public concern. A group effort to gain more

overtime is no less an internal personnel dispute than if it were the effort of one officer. As such, the district court correctly rejected Van Compernolle's argument in this respect.

Van Compernolle's argument that his union-related activities were matters of public concern because they were aimed at the purpose of a union–to provide a voice for his fellow officers in department operations–is also unpersuasive. This Court has firmly held that "an employee's speech, activity, or association, merely because it is union-related, does not touch on a matter of public concern as a matter of law." *Boals v. Gray*, 775 F.2d 686, 693 (6th Cir. 1985). Thus, consistent with the principle that an incidental reference to a public issue does not elevate a statement to a matter of public concern, *see Farhat*, 370 F.3d at 592-93, Van Compernolle must go beyond the fact that his statements and activities on behalf of other officers occurred in a union context and demonstrate that the focus of his speech and activities was fairly related to any matter of political, social, or other concern to the community. *See Boals*, 775 F.2d at 693.

The focus of Van Compernolle's union-related speech and activities related to the personal interests of other officers. The issues Van Compernolle sought to advance concerned overtime compensation, retirement benefits, and the personal disciplinary grievances of other officers. Van Compernolle's description of his speech and activity does not go beyond these broad topics, which can only be characterized as internal personnel disputes. *See Brandenberg*, 253 F.3d at 898; *Gragg v. Somerset Technical College*, 373 F.3d 763, 767 (6th Cir. 2004) (finding that an employee's request for overtime pay was not a matter of public concern but was a grievance of a personal nature where her purpose was to ensure that she received compensation for additional work). *But see Scott v.*

-13-

*Goodman*, 961 F. Supp. 424 (E.D.N.Y. 1997) (finding plaintiff's union activity regarding safety and efficiency of New York City trains touched on matters of public concern).

Furthermore, Van Compernolle's attempt to characterize his union advocacy on these issues as ensuring the patrol officers had a say in the operation of the police department is no more than a "fleeting reference" to an issue arguably of public interest, and does not elevate his speech to a matter of public concern. *See Farhat*, 370 F.3d at 593 (finding employee's references to public corruption in letters were incidental to the focus of the speech and did not make the speech a matter of public concern). Moreover, this argument is directly foreclosed by our holding in *Boals* and undermines the purpose of *Connick's* public concern requirement. Under *Boals*, Van Compernolle must do more than merely associate his speech and activity with the union and our cases have consistently examined the focus of the speech or activity to determine if it addresses a matter of public concern. Otherwise, "virtually every remark–and certainly every criticism directed at a public official–would plant the seed of a constitutional case." *Connick*, 461 U.S. at 147-48. The focus of Van Compernolle's activity in the present case was merely to advance, collectively, internal personnel issues. Even if Van Compernolle subjectively intended to further the union's mission through his activity, the speech and activity involved in this case did nothing to communicate this intent. Hence, Van Compernolle's activities were not protected.

Van Compernolle attempts to elevate his activity to protected status by relying on our finding in *Boals* that an employee who is disciplined solely for his union membership can state a valid claim under the First Amendment. This argument misconstrues *Boals*. We concluded in *Boals* that "an

employee's speech, activity, or association, merely because it is union-related, does not touch on a matter of public concern as a matter of law." *Boals*, 775 F.2d at 693. Notwithstanding this conclusion, we had "no doubt that an employee who is disciplined solely in retaliation for his membership in and support of a union states a valid First Amendment claim under *Connick* and *Pickering*." *Id.* at 693. Thus in *Boals* we recognized the Supreme Court's clear affirmation of the right of public employees to form, join and support unions. *See Smith v. Arkansas State Highway Employees Local 1315*, 441 U.S. 463 (1979) (per curiam). We also recognized that the right of a public employee *to be* a union member is not subject to the same limits as the employee's right *to speak or act* as a union member. *See Boals*, 775 F.2d at 693 (citing *Grossart v. Dinaso*, 758 F.2d 1121, 1230 n.12 (7th Cir. 1985)). Consequently, while a government employer cannot take adverse action against an employee solely because that employee is a union member, the First Amendment does not protect union-related speech or activity affecting the government's interest as an employer unless that speech or activity addresses a matter of public concern. *See Boals,* 775 F.2d at 693. In this case, Van Compernolle does not argue that he was retaliated against solely because he was a union member, but because his activity and speech was union-related. Since, as previously discussed, Van Compernolle has not shown that his activity addressed matters of public concern, it was not protected by the First Amendment.

C.

As an alternative ground for dismissal, the district court found that Van Compernolle had not presented sufficient evidence to create a genuine factual issue as to whether his protected activity,

if any, was a motivating factor for Defendants' adverse employment actions. The district court found that Van Compernolle's evidence consisted of speculation and gross mischaracterizations of the record, and concluded that it was insufficient to create a factual issue for trial. While the issue of whether Defendants' actions were motivated by Van Compernolle's protected activity is one of fact, the determination of whether Van Compernolle has provided sufficient evidence raising a genuine issue of material fact is a question of law. *Taylor v. Keith*, 338 F.3d 639, 643 (6th Cir. 2003). We agree with the district court that the record in this case does not contain evidence from which a reasonable juror could conclude that Defendants' actions were motivated, at least in part, by Van Compernolle's protected conduct.

In support of his claim, Van Compernolle primarily relies on his deposition testimony as well as the depositions and affidavits of several other officers. This evidence, as the district court pointed out, is based on speculation and mischaracterizations of the record, and is insufficient to raise a genuine issue of material fact for trial. While the officers' affidavits state that Van Compernolle was fired because of his union activity and Defendants' improper motive, the depositions make clear that the officers' beliefs are based on either what Van Compernolle told them or their own speculation. Officer Martin Vandervelde's deposition is representative of the speculative nature of Van Compernolle's evidence. In his affidavit, Officer Vandervelde stated that it was clear to him that "Chief Olney and Sergeant Ball both saw [Van Compernolle's] union activities as threatening to them." JA at 949. At Officer Vandervelde's deposition, the following exchange took place:

Q:     How is that clear to you?

-16-

A:    He's terminated now.

Q:    Okay.

A:    So, I mean, obviously–

Q:    What's your support for saying that it's clear to you?

A:    That his allegations, up until the point he was terminated, had just confirmed that he was being – Chris's side of the story, he was being scrutinized because of his union activities and mistakes he's made on his time card.

Q:    And that's from what Chris told you?

A:    That's correct.

JA at 949. As is clear from the deposition, Officer Vandervelde's opinion was based on nothing more than Van Compernolle's allegations. This is not sufficient to create a factual issue for trial.

In their defense, Defendants have stated a permissible reason for Van Compernolle's discipline and eventual termination: Van Compernolle had repeatedly submitted inaccurate time sheets. In 2002, Van Compernolle was disciplined for claiming that he worked twenty-eight hours that he did not. He received counseling for a similar error in November 2003. In 2004, Van Compernolle was again disciplined for claiming hours that he did not work. Finally, in June 2004, Van Compernolle reported that he worked a twelve hour shift when he had in fact called in sick. Van Compernolle does not dispute that he submitted the inaccurate time sheets or that he violated specific work rules. Rather, Van Compernolle suggests that he was held to a higher standard because of his status as union president and because he challenged Chief Olney's authority. Again, Van Compernolle's contention finds no support in the record.

Van Compernolle claims that he was the only officer ever disciplined for making mistakes

on his time card and that this disparate treatment is evidence of Defendants' improper motive. Unlike Van Compernolle's errors, though, none of the other officers' mistakes rose to the same severity as Van Compernolle's inaccuracies. *See* JA 383-85. Generally, these other mistakes consisted of placing the correct numbers in the wrong column, mathematical errors, failing to sign or date their card, and improper interpretation of overtime or holiday pay. *See* JA at 383-85. According to Chief Olney, officers frequently misunderstood how to account for holiday pay. *See* JA at 383. He further explained that this seemed to be a "question of interpretation of the contract." JA at 383. On the other hand, Van Compernolle's mistakes consisted of reporting hours that he did not work.

When an officer did make a mistake similar to Van Compernolle, the Chief disciplined him. Officer Robert Ten Harmsel was disciplined in August 2003 when he reported working a twelve hour shift but had in reality used twelve hours of vacation time. *See* JA at 402. As a result, Officer Ten Harmsel received a written discipline for submitting an inaccurate report. *See* JA at 412. While Van Compernolle's first discipline was more severe than Officer Ten Harmsel's written discipline, Van Compernolle's errors amounted to twenty-eight additional hours of pay compared to Ten Harmsel's twelve hours of pay. Additionally, Chief Olney exercised restraint when disciplining Van Compernolle, choosing the least severe alternative in the first instance, holding part of Van Compernolle's first suspension in abeyance, and allowing him to use accrued comp time in lieu of serving his second suspension. Van Compernolle also admitted that when he did make minor errors similar to those of the other officers, the Chief corrected the mistakes for him without discipline.

*See* JA at 924. This undermines Van Compernolle's claim of disparate treatment.

Van Compernolle also mischaracterizes the record in an effort to create the impression that Defendants resented his advocacy in favor of expanding comp time. In contrast to Van Compernolle's claims, comp time was not an issue during the negotiations until the union proposed increasing the number of hours an officer could bank from fifty to eighty per year. *See* JA at 863. The city countered this offer, proposing an increase to sixty hours, after which the union withdrew its offer and the comp time system remained the same. *See id.* Van Compernolle also exaggerates Chief Olney's position on comp time, claiming that the Chief desired to eliminate comp time entirely. Yet Chief Olney merely stated that the use of comp time made administering the office difficult because it required management to rearrange schedules to make sure enough officers were on duty. *See* JA at 894. The Chief further explained that he "wouldn't get rid of [comp time], but ... would like to see it restricted somewhat" due to the scheduling issues. JA at 889, 894. Thus the record does not demonstrate that Defendants had any particular desire to eliminate comp time or that it was a hot issue such that Van Compernolle's advocacy would garner the disdain of management.

The record also contradicts Van Compernolle's assertion of general hostility toward the union. Chief Olney had been an active union member while a state trooper and recognized that conflicts between management and the union were inherent due to the parties' opposing interests. *See* JA at 891, 897. Chief Olney stated "I probably said something to [Van Compernolle] that I understand that, yeah, there's going to be conflict over certain issues. There's probably no way to avoid it, you know. You're taking this position, this is my position, so, sure, we're not going to

agree on some things." JA at 897. Furthermore, Chief Olney initiated a meeting at which the union members could voice their concerns regarding Sgt. Ball. *See* JA at 930-31. Essentially, Van Compernolle's evidence shows that Defendants were aware of his position and advocacy with the union; this is not sufficient to show that Defendants were hostile toward the union or that their employment decisions were motivated by Van Compernolle's protected activity.

Van Compernolle's reliance on Sgt. Ball's comments as evidence of retaliatory motive is also misplaced. While riding with Sgt. Ball, Van Compernolle asked him why he thought Van Compernolle was being subjected to discipline. Van Compernolle stated that Sgt. Ball told him that it was "a management technique" to take the "biggest and the baddest guy and you knock him down a few pegs and, you're their leader." JA at 925. However, this statement is merely Sgt. Ball's subjective belief as to why Chief Olney disciplined Van Compernolle, and does not indicate any animus towards the union or Van Compernolle. Van Compernolle's own testimony refuted this inference when he stated that Chief Olney recognized the difficulty of Van Compernolle's position in having to represent other officers, which opens him up to increased scrutiny. *See* JA at 925-26. Van Compernolle further stated that Chief Olney "may have even said he respects a guy in my position, because I'm the one who wants to do that, and it's not easy to do that." JA at 925. In any event, Sgt. Ball's statement is inadmissible hearsay and cannot be used to create a factual issue for trial.

Finally, Van Compernolle contends that the "direct connection in time and events provide an inference that matches [Van Compernolle's] union activities to the Chief and Sergeant's bearing

-20-

down upon him on the time card issues." Appellant's Br. at 44. Other than the fact that Van Compernolle's third and final discipline occurred a month after he filed his grievance regarding the corporal promotion, the record does not show that Van Compernolle's adverse treatment necessarily followed his union activity. Furthermore, the time sheet error that prompted Van Compernolle's dismissal occurred closer to the time of his discipline than his union activity. Temporal proximity on its own is insufficient to create a factual issue of improper motive, especially in light of Defendants' legitimate reasons for disciplining and eventually terminating Van Compernolle. *See Wells*, 106 Fed. Appx. at 325 (rejecting plaintiff's argument that the temporal proximity of events alone was sufficient to demonstrate defendant's reasons for adverse employment action were pretextual).

Van Compernolle has failed to present evidence sufficient to raise a genuine issue of fact as to whether his protected conduct was a motivating factor in his discharge. Consequently, he cannot demonstrate an essential element of his prima facie case, and the district court did not err when it granted summary judgment for Defendants.

## IV.

Based on the reasons set forth above, the district court's order granting summary judgment in favor of Defendants on Van Compernolle's First Amendment retaliation claim under 42 U.S.C. § 1983 is AFFIRMED.

**RONALD LEE GILMAN, Circuit Judge, concurring**. The lead opinion holds that Van Compernolle did not engage in protected speech and, in the alternative, that any such allegedly protected speech did not motivate the City's decision to terminate him. Because the first determination is unnecessary in light of the second, and because I believe that Van Compernolle presents a convincing argument that he was engaged in protected activity, I concur only in that portion of the lead opinion concerning the City's valid reason for terminating him.

I read the lead opinion as reaching two conclusions regarding whether Van Compernolle has asserted valid First Amendment grounds in support of his retaliation claim. First, the lead opinion holds that Van Compernolle "does not argue that he was retaliated against solely because he was a union member, but because his activity and speech were union-related." Maj. Op. at 15. Second, the lead opinion concludes that the particular union-related speech and activities Van Compernolle cites as evidence of his union participation were not protected because they did not address matters of public concern. Maj. Op. at 14. I take issue with both of these conclusions.

The lead opinion properly acknowledges that the *Boals* court had "no doubt that an employee who is disciplined solely in retaliation for his membership in and support of a union states a valid First Amendment claim under *Connick* and *Pickering*." Lead Op. at 15. In keeping with this holding, Van Compernolle explicitly "does not allege that one particular statement, press release, or document constituted the [protected] speech or association at issue . . . , but rather tha[t] the Appellee's anti-union animus . . . motivated Appellant's termination as head of the union." Van Compernolle could hardly make clearer his argument that he, as union president, was fired for

precisely the ground that the *Boals* court had "no doubt" warranted protection under *Connick*—"his membership in and support of a union." *Boals v. Gray*, 775 F.2d 686, 693 (6th Cir. 1985).

Had Van Compernolle's simply asserted that he was president of the policeman's union, that the City was aware of his status as union president, and that it fired him as a result its anti-union animus—*and had he left it at that*—he would presumably have stated a valid First Amendment claim even under the lead opinion's analysis. Instead, because Van Compernolle supports his position that he was fired due to his status as union president by including some examples of legitimate union-related activities in which he engaged, such as negotiating with management and raising employee grievances, the lead opinion concludes that his claim fails. This holding would seem to imply that an employee cannot be fired due to his status as a union member or as its president, except where he also alleges that he actually engaged in union-related activity. On the other hand, where an employee claims that he was fired due to his union-member status but does not assert that he engaged in union-related activities, a court would likely find such a claim unsupported and deny it on that ground. This leads to a Catch-22 situation that risks reading the operative language in *Boals*, which protects an employee's union-member status, out of the opinion entirely.

I also disagree with the lead opinion's conclusion that the particular examples Van Compernolle cites of union-related activities in which he engaged were not matters of public concern. The activities that Van Compernolle undertook as union president—promoting collective union action, representing other union employees in their grievances against management, negotiating on behalf of the union for better pay and benefits, etc.—all unsurprisingly worked to the

-23-

benefit of union members and did not generally address topics of concern to the public at large. The lead opinion consequently concludes that such speech and associative activity are not protected. Lead Op. at 14. To be sure, had Van Compernolle simply claimed that he raised his own personal grievances to management through the union, his activities would not touch on matters of public concern solely because they happened to be union-related. *See, e.g.*, *Gragg v. Somerset Technical Coll.*, 373 F.3d 763, 767 (6th Cir. 2004) (finding that an employee's request for overtime pay was not a matter of public concern, but was a grievance of a personal nature where her purpose was to ensure that she received compensation for the additional work).

Other circuits, however, have reasoned that some of the specific types of speech that Van Compernolle engaged in as union president on behalf of his constituency *do* touch on matters of public concern, even if they advanced only union-specific causes. *See Cook v. Gwinnett County Sch. Dist.*, 414 F.3d 1313, 1319 (11th Cir. 2005) (holding that a union president's recruiting of fellow bus drivers to join the union touched on a matter of public concern because she did so "to improve a variety of conditions, not only for herself individually, but rather for the collective welfare of her fellow drivers"); *Clue v. Johnson*, 179 F.3d 57, 61 (2d Cir. 1999) (holding that "activities on behalf of a union faction that necessarily entail a substantial criticism of management raise matters of public concern under *Connick*"); *Gregorich v. Lund*, 54 F.3d 410, 416 (7th Cir. 1995) (holding that a research attorney's "attempt to obtain representation for all research attorneys in the Fourth District went beyond his self-interest" and made his activity a matter of public concern).

These cases do not stand for the proposition that all union-related speech necessarily touches

on a matter of public concern. Instead, they suggest that a union representative's advocacy on behalf of other union members *does* touch on matters of public concern, even if the particular subject matter of the advocacy ordinarily would not.

As I mentioned above, however, I believe that a determination of whether Van Compernolle has set forth valid First Amendment grounds in support of his retaliation claim is ultimately unnecessary to the resolution of this case. Consequently, I decline to join that portion of the lead opinion.