RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 22a0160p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

─────────────────

JAMES MYERS,

                *Plaintiff-Appellee*,

   *v.*

CITY OF CENTERVILLE, OHIO,

                *Defendant*,

WAYNE DAVIS; MATTHEW BROWN,

                *Defendants-Appellants*.

No. 21-3850

─────────────────

Appeal from the United States District Court for the Southern District of Ohio at Dayton.
No. 3:20-cv-00402—Michael J. Newman, District Judge.

Argued:  April 28, 2022

Decided and Filed:  July 21, 2022

Before:  SUHRHEINRICH, MOORE, and CLAY, Circuit Judges.

─────────────────

## COUNSEL

**ARGUED:**  Dawn M. Frick, SURDYK, DOWD & TURNER CO., L.P.A., Dayton, Ohio, for Appellants.  Laura Welles Wilson, FREKING MYERS & REUL LLC, Cincinnati, Ohio, for Appellee.  **ON BRIEF:**  Dawn M. Frick, Edward J. Dowd, SURDYK, DOWD & TURNER CO., L.P.A., Dayton, Ohio, for Appellants.  Laura Welles Wilson, Katherine Daughtrey Neff, FREKING MYERS & REUL LLC, Cincinnati, Ohio, Jeffrey M. Silverstein, FREKING MYERS & REUL LLC, Dayton, Ohio, for Appellee.

—————————————

**OPINION**

—————————————

SUHRHEINRICH, Circuit Judge.

By nearly all accounts, James Myers was a model employee for the City of Centerville, steadily climbing the Police Department's ranks over three decades to become a detective sergeant. In 2015, however, Myers started causing headaches for the City's bigwigs—in a smalltown, Frank Serpico sort of way. He reported several serious allegations of misconduct among the Department's upper brass, some of which have yet to be fully investigated. He also stood up for an acquaintance in the Public Works Department, whom he thought the City had unfairly fired. The City returned the favor, suspending Myers without pay for five days. Not long thereafter, the City fired Myers, allegedly for secretly recording a meeting between him, City Manager Wayne Davis, and Police Chief Matt Brown. Myers sued the City, Davis, and Brown, alleging a First Amendment retaliation claim under 42 U.S.C. § 1983 and several state-law claims.

The defendants moved for judgment on the pleadings, arguing (among other things) that Myers failed to state a claim and that Davis and Brown are entitled to qualified immunity and statutory immunity under Ohio law. The district court summarily denied the motion, which Davis and Brown now appeal. We hold that the district court erred by failing to meaningfully analyze their assertions of immunity at the pleadings stage, but we affirm after concluding that Myers plausibly alleged a First Amendment retaliation claim and that the defendants are not yet entitled to qualified or statutory immunity.

**I. Background**

Because this appeal comes to us from the denial of a motion for judgment on the pleadings, we assume as true the facts alleged in Myers's complaint and draw all reasonable inferences in his favor. *Coley v. Lucas County*, 799 F.3d 530, 536–37 (6th Cir. 2015). The following facts are thus taken from his complaint.

*A. Allegations Against Lavigne & Robertson*

In 2015, Myers reported to his supervisors, then-Lieutenant Matt Brown (defendant here) and then-Police Chief Bruce Robertson, that another supervisor in the Department created, possessed, and "possibl[y] disseminat[ed]" "sexually explicit photos of minors." That supervisor apparently was Lieutenant Lavigne,[1] who transferred illicit images from minors' cell phones to his personal cell phone; those minors were being investigated "as part of a 'sexting' complaint at Centerville High School." Over the coming years, Myers continued to pursue this allegation against Lavigne (and a separate allegation that Lavigne violated a City ordinance), which largely fell on deaf ears. Chief Robertson promised to follow up, but he ultimately investigated only the ordinance violation, for which Lavigne received "an oral reprimand."

In 2018, Myers went up the chain of command. He sought whistleblower protection and met with City Manager Wayne Davis (another defendant here) to report new allegations "related to theft in office and dereliction of duty" against Chief Robertson, and to repeat the child-pornography allegation against Lavigne. That led to Myers meeting with an outside attorney appointed by Davis; the attorney said he would investigate the claims against Robertson "at [Davis's] request," but that the claims against Lavigne would be investigated by an outside agency (the Kettering Police Department) "due to the[ir] severity." After learning of the investigation against him, Robertson "abruptly retired," and the City appointed Lieutenant Brown as interim police chief.

Myers was interviewed but not hired for the vacant chief post; the City picked Brown instead. The hiring panel for that position included Lavigne, which Myers viewed as "highly unethical and improper" given Myers's allegations against him.

To air those complaints, Manager Davis held a meeting with Chief Brown and Myers on August 1, 2018. Myers made an audio recording of this meeting. Although the meeting was called to discuss the chief hiring process, it devolved into rehashing Myers's earlier allegations against Robertson and Lavigne. Davis asserted that "'full on' investigations were conducted

---

[1]Cryptically, the complaint stops just short of directly identifying that supervisor, but the allegations strongly imply that the supervisor was Lavigne—a point that the defendants confirmed in their briefing below and here. For that reason, we refer to the supervisor as Lavigne.

into" Myers's allegations. "When Myers confront[ed]" Davis and Brown "about the findings of the investigations, he [wa]s advised that no criminal wrongdoing was found after being reviewed by 'multiple prosecutors.'" Myers asked which prosecutors, "and Chief Brown did not answer."**[2]**

By February 2020, Kettering had yet to conduct "a formal investigation or [a] review[] [of] the case [regarding Lavigne] with a prosecutor." In the meantime, Myers was passed over not only for the chief's position, but two vacant lieutenant positions as well. And although he was admitted to the FBI National Academy after being waitlisted for several years, Quantico rescinded that offer after its background investigator spoke to Lavigne.

Mindful of that context, we review the facts supporting Myers's First Amendment claim.

*B. The "Brannon Letter" and its Fallout*

In October 2018, Myers learned that Brad Kavalunas, a longtime employee of the City's Public Works Department "with whom [Myers] was familiar," was fired for actions and speech that the City deemed "bigot[ed]" and harassing. Although Myers was not involved in any investigation leading to Kavalunas's termination, Kavalunas asked him for "a character letter." Myers obliged, writing a letter off-the-clock and at home; that letter, which the parties dub the "Brannon Letter," was later given to Manager Davis by Kavalunas's attorney.

The letter explained that Myers has known Kavalunas for over two decades, that he's a caring person and a good employee, and that his professional reputation is one "of diligence, trustworthiness, and dependability." Myers thus wrote that he "was both surprised and saddened" to learn of Kavalunas's alleged misconduct, given that Myers could not recall "one instance" in which Kavalunas behaved in the way alleged. Myers also expressed his admiration for the "sense of teamwork and comradery among" the Public Works staff, and that he "long[s] for such unity among my fellow brothers and sisters in law enforcement."

---

**[2]**Also during that meeting, "Myers provided additional information to Chief Brown about [Lavigne] reportedly receiving a massage from a local woman whom Myers had previously reported as" a suspected prostitute. By the end of October 2018, Myers learned that no Internal Affairs investigation had been opened as to this allegation either.

And Myers went on.  First, he recalled witnessing "many instances of . . . 'shop or locker room talk'" among the Public Works staff, language that "was frequently inappropriate."  He described Public Works as having a "culture where grown men were accustomed to behaving as adolescents"—conduct that "was pervasive and not limited to just a select few employees."  Second, Myers placed Kavalunas's alleged misconduct in the context of that culture, explaining that "the workplace conduct alleged [against Kavalunas] is or was much more systemic"—his alleged behavior "was just part of the everyday norm" of Public Works.  Third, he argued that such conduct "should certainly not be justified," but "it seems ill-advised to single out one individual as the 'poster child' for the same or similar conduct displayed by many in the same group over the last two plus decades."  And, given Kavalunas's long tenure with the City, Myers thought "an alternative to termination" would have "better served" the City.

In November 2018, Myers was summoned to discuss the Brannon Letter with the City's human resources manager and its outside labor counsel.  At no point during that meeting did they tell Myers that he did anything wrong or that the contents of the letter were disparaging to the City.  Later the next month, however, Myers was called into Lavigne's office; Lavigne "informed [Myers] that he was being brought up on internal charges" relating to the letter.  Lavigne did not specify which rules or polices were allegedly violated, despite Myers's "asking repeatedly."  Myers thought Lavigne was retaliating against him in part for his previous complaints, so he refused to continue the interview without a union representative present; the interview was rescheduled.

Lavigne ultimately asserted that Myers "potentially violated several City and Departmental rules by writing the letter," one of which "was insubordination because Myers had allegedly been told in the past not to intervene with the investigation or disciplinary matters of other employees"—a point renewed the next month in a memo penned by Chief Brown.  Myers "denied and refuted" that he was ever so told.  In June 2019, Manager Davis suspended Myers for five days without pay "for allegedly being insubordinate and for criticism of the City" in the letter.

There things stood until November 2019.  At that point, the City learned that Myers recorded the August 1, 2018, meeting (the one called to discuss Myers's concerns about the chief

hiring process).  The City placed Myers on paid administrative leave pending an investigation of the recording.

The investigation took its course, and Davis fired Myers in March 2020—not for writing the Brannon Letter, but "for alleged misconduct involving purported dishonesty related to withholding of the audio recording."  The City later issued a press release (republished "almost verbatim" in the newspaper), which Myers claims "was factually inaccurate, prejudicial, defamatory, and retaliatory."

In June 2020, the City's Personnel Appeals Board affirmed Myers's prior five-day suspension based on the Brannon Letter.  "Immediately" thereafter, the City again "issued a press release in which Chief Brown falsely and publicly stated, 'we cannot and will not tolerate any sort of bigotry or those who support it,' falsely stating both expressly, and by implication, that Myers was a bigot or had been accused of any actions constituting bigotry."

*C.  Procedural Background*

Myers then sued Manager Davis and Chief Brown (in their individual and official capacities), as well as the City, alleging First Amendment retaliation based on the Brannon Letter, and five state-law claims, the nature of which are irrelevant at this stage.  The defendants moved for judgment on the pleadings, arguing (among other things) that Davis and Brown are entitled to qualified immunity as to Myers's First Amendment claim and statutory immunity as to all other claims under Ohio Revised Code § 2744.03(A)(6).  The district court denied the motion in a three-page order that analyzed neither qualified nor statutory immunity.  Davis and Brown (but not the City) filed this interlocutory appeal, arguing they were wrongly deprived of those immunity defenses.

## II.  Jurisdiction

*A.  Jurisdiction Over the Denial of Qualified Immunity*

We have jurisdiction over only "final decisions of the district courts."  28 U.S.C. § 1291. Although an order denying a Rule 12(c) motion for judgment on the pleadings generally does not fit that bill, it does when the order "conclusively determine[s]" the defendants' entitlement to

qualified immunity.  *Mitchell v. Forsyth*, 472 U.S. 511, 527 (1985); *see also Moderwell v. Cuyahoga County*, 997 F.3d 653, 659 n.4 (6th Cir. 2021).

Arguably, the district court's order did not conclusively determine the defendants' entitlement to qualified immunity; indeed, as discussed further below, it did not even recite the qualified-immunity standard, and it deferred ruling on all issues until summary judgment.  But we have previously recognized that a nondecision on a timely assertion of qualified immunity is still a decision—it's a denial—and is thus immediately appealable.  *See Everson v. Leis*, 556 F.3d 484, 492 (6th Cir. 2009) (finding jurisdiction to review the district court's decision to hold in abeyance, pending additional discovery, a motion for summary judgment based on qualified immunity); *Summers v. Leis*, 368 F.3d 881, 886 (6th Cir. 2004) (same, where the order denied without prejudice, pending additional discovery, a motion for summary judgment based on qualified immunity); *Wallin v. Norman*, 317 F.3d 558, 562–63 (6th Cir. 2003) (similar); *Skousen v. Brighton High Sch.*, 305 F.3d 520, 527 (6th Cir. 2002) (similar); *cf. Buddenberg v. Weisdack*, 939 F.3d 732, 738 (6th Cir. 2019) (similar, where the order explained that the clearly established prong, though not the constitutional-violation prong, was "premature and cannot be determined at this stage in the litigation").

Here too, in punting a decision on qualified immunity, the district court effectively denied it—as it unlocked discovery without answering the "threshold immunity question."  *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).  We therefore have jurisdiction to review that order.

Myers says that's wrong, but for a different reason.  Citing *Johnson v. Jones*, 515 U.S. 304, 317 (1995), he argues we lack jurisdiction because the district court, in his view, found "that the factual record [wa]s insufficient for a determination at this stage of the proceedings."  True, *Johnson* held that a denial of a *summary-judgment* motion raising qualified immunity is not immediately appealable if it "determines only a question of 'evidence sufficiency,' *i.e.*, which facts a party may, or may not, be able to prove at trial."  *Id.* at 313.  But *Johnson* does not logically extend to the *pleadings* stage, a stage at which the court must assume all well-pleaded facts as true.  *See, e.g.*, *Ashcroft v. Iqbal*, 556 U.S. 662, 674–75 (2009) ("Evaluating the sufficiency of a complaint is not a 'fact-based' question of law, [unlike denying summary

judgment based on evidence sufficiency,] so . . . *Johnson* is not implicated here."). Because all facts are assumed as true, it follows that "there cannot be any disputed questions of fact" when deciding a motion for judgment on the pleadings. *Barnes v. Winchell*, 105 F.3d 1111, 1114 (6th Cir. 1997). *Johnson*'s bar is thus not triggered, *id.*, and that's so despite the district court's expressed reasons for denying the motion—because "our review solely involves applying principles of law to a given and assumed set of facts," *id.*

Our authority to review the defendants' qualified-immunity defense is therefore clear. And that review extends to the merits-based, legal question of whether Myers engaged in constitutionally protected speech (the only element the defendants challenge now) and thereby plausibly alleged a First Amendment retaliation claim. *See, e.g.*, *Charvat v. E. Ohio Reg'l Wastewater Auth.*, 246 F.3d 607, 616 (6th Cir. 2001).

### B. Jurisdiction Over the Denial of State-Law Immunity

The defendants also asserted statutory immunity under Ohio Revised Code § 2744.03 as to Myers's state-law claims, the denial of which they also now appeal. One way to determine whether we have jurisdiction over that denial is if Ohio law says so. *See Livermore ex rel. Rohm v. Lubelan*, 476 F.3d 397, 407 (6th Cir. 2007). And it does; we have interpreted Ohio law (since 2003) to provide immunity from suit, not just liability, so a denial of that immunity is immediately appealable. *Chesher v. Neyer*, 477 F.3d 784, 794 (6th Cir. 2007); *Range v. Douglas*, 763 F.3d 573, 581 (6th Cir. 2014); *see also* Ohio Rev. Code § 2744.02(C) (providing that "[a]n order that denies . . . the benefit of an alleged immunity from liability as provided in this chapter or any other provision of the law is a final order"). However, our review is "limited to the specific issue of whether immunity was properly denied"—it does not extend to "the underlying merits of the state [law] claims." *Range*, 763 F.3d at 582.

### III. Legal Standards

We review the denial of a motion for judgment on the pleadings de novo, using the same standards that apply to Rule 12(b)(6) motions to dismiss. *Coley*, 799 F.3d at 536–37; *Fritz v. Charter Township of Comstock*, 592 F.3d 718, 722 (6th Cir. 2010). A motion for judgment on the pleadings is thus properly denied where the complaint "contain[s] sufficient factual matter,

accepted as true, to 'state a claim to relief that is plausible on its face.' A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

A defendant is not entitled to qualified immunity at the pleadings stage if (1) "the facts alleged make out a violation of a constitutional right" and (2) that right "was clearly established when the event occurred so that a reasonable offic[ial] would have known that his conduct violated it." *Crawford v. Tilley*, 15 F.4th 752, 762–63 (6th Cir. 2021) (quoting *Buddenberg*, 939 F.3d at 738). Although "a plaintiff is generally not required to negate an affirmative defense [like qualified immunity] in a complaint[,] . . . the validity of such defenses may be apparent from the face of the complaint, rendering a motion [for judgment on the pleadings] appropriate." *Id.* at 763.

## IV. Failure to Address Qualified Immunity

Before proceeding to the merits, we address the district court's failure to meaningfully evaluate the defendants' assertion of qualified immunity. As noted, the district court summarily denied that defense, stating in relevant part:

> Having carefully and thoroughly considered the pleadings and briefing in support of and in opposition to Defendants' motion, along with the procedural posture of this case, the Court believes the efficient and appropriate way forward is to permit discovery to occur and consider the parties' arguments on summary judgment, not earlier at the motion-to-dismiss phase of the litigation. Proceeding in this manner will ensure the Court reviews these arguments only after appropriate discovery has been completed and will guarantee that the Court's consideration of the parties' arguments is not premature.

The court then cited *Buddenberg*, 939 F.3d at 739–40, and *Wesley v. Campbell*, 779 F.3d 421, 433–34 (6th Cir. 2015), without elaboration. Though we cannot know for sure, it's a fair guess that the district court relied on *Wesley*'s assertion (adopted by *Buddenberg*) "that 'it is generally inappropriate for a district court to grant a 12(b)(6) motion to dismiss on the basis of qualified immunity.'" *Buddenberg*, 939 F.3d at 738–39 (quoting *Wesley*, 779 F.3d at 433). The court erred by doing so.

We held, long before *Buddenberg* and *Wesley*, that district courts have "a duty to address" qualified immunity when it is "properly raised prior to discovery." *Summers*, 368 F.3d at 886; *see also Skousen*, 305 F.3d at 527 ("[T]he district court was required to determine—prior to permitting further discovery—whether [the plaintiff's] complaint alleged the violation of a constitutional right at all, and if so, whether that right was clearly established[.]"). After all, qualified immunity shields government defendants not merely from liability, but also from litigation and discovery, because "[i]nquiries of this kind can be peculiarly disruptive of effective government." *Harlow*, 457 U.S. at 817; *see also Anderson v. Creighton*, 483 U.S. 635, 646 n.6 (1987) (re-affirming that qualified immunity protects officials from "broad-ranging discovery" (cleaned up)). *Buddenberg* and *Wesley* could not have disturbed that long-settled precept, *see, e.g.*, *Salmi v. Sec'y of Health & Hum. Servs.*, 774 F.2d 685, 689 (6th Cir. 1985), so they could not (and do not) give license to deny qualified immunity, without a reasoned opinion, whenever the defense is raised in a Rule 12 motion.

However, as we recently explained in *Crawford*, *Wesley* does have a point: analyzing the *second* prong of qualified immunity—whether the alleged constitutional violation is clearly established—"is sometimes difficult" on the pleadings, since that "inquiry may turn on case-specific details that must be fleshed out in discovery." *Crawford*, 15 F.4th at 765 (collecting cases); *see also Siefert v. Hamilton County*, 951 F.3d 753, 761 (6th Cir.) ("Without more than the complaint to go on, the court 'cannot fairly tell whether a [right] is "obvious" or "squarely governed" [and thus clearly established] by precedent,' making qualified immunity inappropriate." (quoting *Guertin v. Michigan*, 912 F.3d 907, 917 (6th Cir. 2019))), *cert. denied sub nom. Hamilton Cnty. Job & Fam. Servs. v. Siefert*, 141 S. Ct. 896 (2020). That, *Crawford* explained, is what *Wesley*'s "at best imprecise" language meant to convey. *Crawford*, 15 F.4th at 763 ("[M]ost statements of this proposition are careful to explain that its application rests on qualified immunity's clearly established prong."); *id.* at 765.

Still, that "is only a 'general preference,' not an absolute one." *Siefert*, 951 F.3d at 761 (quoting *Guertin*, 912 F.3d at 917); *Crawford*, 15 F.4th at 765 (explaining that "the inquiry is nuanced" and not reducible to a hard-and-fast rule). In some cases, the clearly established prong may be determined on the pleadings. Indeed, *Buddenberg* itself determined, on appeal from the

denial of a motion to dismiss raising qualified immunity, that the plaintiff's "right to report public corruption, unethical conduct, and sex-based discrimination within her workplace was clearly established."  939 F.3d at 741.

More importantly, *Crawford* made crystal clear that that general preference does not at all cover qualified immunity's *first* prong—whether the complaint plausibly alleged a constitutional violation.  15 F.4th at 764–65 (discussing *Iqbal*, 556 U.S. at 687, which reversed the denial of qualified immunity raised in a Rule 12(b)(6) motion after concluding that the plaintiff failed to plausibly plead a constitutional violation).  Put differently, if the complaint fails to allege facts plausibly showing the violation of a constitutional right (regardless of whether that right was clearly established), granting qualified immunity is appropriate on the pleadings.  *Id.*; *see Siefert*, 951 F.3d at 762.  The assertion of qualified immunity, by itself, does not change that.

So, in this case, as in every other case in which a defendant timely raises qualified immunity, the district court was required to determine whether Myers plausibly alleged a constitutional violation and, if so, whether that right was clearly established.  *See Skousen*, 305 F.3d at 527.  But we need not vacate the district court's order and remand because, based on our de novo review of the pleadings, we answer both of those questions in the affirmative.

## V.  Qualified Immunity

### A.  Constitutional Violation: First Amendment Retaliation

Myers claims that the defendants violated the First Amendment by retaliating against him for writing the Brannon Letter.[3]  A First Amendment retaliation claim has three elements:

> (1) the plaintiff engaged in protected conduct [*i.e.*, constitutionally protected speech]; (2) an adverse action was taken against the plaintiff that would deter a person of ordinary firmness from continuing to engage in that conduct; and (3) . . . the adverse action was motivated at least in part by the plaintiff's protected conduct.

---

[3]In his response brief, Myers argues that his First Amendment retaliation claim is based not only on the Brannon Letter, but also his prior misconduct allegations against Chief Robertson and Lieutenant Lavigne.  Myers did not make this argument below, so we do not consider it here.  *See 600 Marshall Ent. Concepts, LLC v. City of Memphis*, 705 F.3d 576, 585 (6th Cir. 2013).  We express no opinion, however, as to whether Myers may do so in the district court.  *Cf. generally Mayhew v. Town of Smyrna*, 856 F.3d 456, 466–67 (6th Cir. 2017).

*Thaddeus-X v. Blatter*, 175 F.3d 378, 394 (6th Cir. 1999) (en banc). The defendants challenge only the first element, arguing that the Brannon Letter is not protected speech. We address only that element too.

### 1. Protected Speech for Public Employees

"[A]lmost all speech is protected[,] other than 'in a few limited areas.'" *Novak v. City of Parma*, 932 F.3d 421, 427 (6th Cir. 2019) (quoting *United States v. Stevens*, 559 U.S. 460, 468 (2010)); *see also Thaddeus-X*, 175 F.3d at 388 (describing the "multiple levels of protection for different types of speech"). Things get complicated, however, when a public employee speaks—because such speech pits the employee's interests in speaking freely against the employer's interests in running an efficient workplace. *See generally Connick v. Myers*, 461 U.S. 138, 142 (1983); *Pickering v. Bd. of Educ.*, 391 U.S. 563, 568 (1968).

Courts use a three-prong test to determine if a public employee's speech is constitutionally protected. *See generally Handy-Clay v. City of Memphis*, 695 F.3d 531, 540 (6th Cir. 2012). First, the employee must have spoken as a private citizen, not "pursuant to [his or her] official duties." *Garcetti v. Ceballos*, 547 U.S. 410, 421 (2006). Second, the speech must involve "matters of public concern." *Connick*, 461 U.S. at 143. Third, the employee's interests, "as a citizen, in commenting upon matters of public concern," must outweigh "the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." *Pickering*, 391 U.S. at 568. Whether a public employee's speech is constitutionally protected is a question of law. *Mayhew*, 856 F.3d at 463.

As to the Brannon Letter, the defendants challenge only prongs two and three—arguing that the letter did not involve a matter of public concern and that, even if it did, Myers's interests in writing the letter did not outweigh the City's interests in running an efficient workplace. We therefore assume that Myers wrote the Brannon Letter as a private citizen, and we analyze only prongs two and three.

*a. Matters of Public Concern*

*General Principles.*   To determine whether speech involves a matter of public concern, we consider "the content, form, and context of [the] statement, as revealed by the whole record." *Connick*, 461 U.S. at 147–48.   "While motive for the speech is a relevant factor, . . . 'the pertinent question is not *why* the employee spoke, but *what* he said.'"   *Westmoreland v. Sutherland*, 662 F.3d 714, 719 (6th Cir. 2011) (quoting *Farhat v. Jopke*, 370 F.3d 580, 591 (6th Cir. 2004)).   That means "[w]e examine 'the *point* of the speech in question[.]'"   *Mayhew*, 856 F.3d at 467 (quoting *Boulton v. Swanson*, 795 F.3d 526, 534 (6th Cir. 2015)).

We next ask whether that point concerned the public.   Broadly stated, "speech involves a matter of public concern when it can fairly be considered to relate to 'any matter of political, social, or other concern to the community.'"   *Westmoreland*, 662 F.3d at 719 (quoting *Connick*, 461 U.S. at 146).   Put differently, speech concerns such matters "when it 'is a subject of legitimate news interest; that is, a subject of general interest and of value and concern to the public.'"   *Lane v. Franks*, 573 U.S. 228, 241 (2014) (quoting *Snyder v. Phelps*, 562 U.S. 443, 453 (2011)).

For example, "we have consistently reiterated that allegations of public corruption 'are exactly the type of statements that demand strong First Amendment protections.'"   *Mayhew*, 856 F.3d at 468 (quoting *Handy-Clay*, 695 F.3d at 543–44).   So too are statements "[e]xposing governmental inefficiency and misconduct," *Garcetti*, 547 U.S. at 425, as well as those addressing "failure[s] to follow state law, major state policy decisions, or discrimination of some form," *Boulton*, 795 F.3d at 532 (citations omitted).   In those easy cases, the public clearly has an interest in hearing the speech.

At the other end of the spectrum is "the quintessential employee beef: management has acted incompetently." *Barnes v. McDowell*, 848 F.2d 725, 735 (6th Cir. 1988) (quoting *Murray v. Gardner*, 741 F.2d 434, 438 (D.C. Cir. 1984)).   Hence, speech about "internal personnel disputes" generally does not involve matters of public concern. *Brandenburg v. Hous. Auth. of Irvine*, 253 F.3d 891, 898 (6th Cir. 2001).   After all, "the First Amendment does not require a

public office to be run as a roundtable for employee complaints over internal office affairs." *Connick*, 461 U.S. at 149.

However, even if speech addresses an internal personnel dispute, it may involve a matter of public concern if the dispute arose from "actual or potential wrongdoing or any breach of the public trust." *Brandenburg*, 253 F.3d at 898 (quoting *Brown v. City of Trenton*, 867 F.2d 318, 322 (6th Cir. 1989)). The distinction makes sense given the competing rationales. Most internal personnel disputes implicate only "the employee's personal interest[s] *qua* employee," *Brown*, 867 F.2d at 322, while disputes arising from wrongdoing or breaches of trust implicate broader interests in good governance and democratic control, *see id.*; *Farhat*, 370 F.3d at 590 (noting speech containing information that facilitates "informed decisions about the operation of . . . government" involves a matter of public concern).

Here, we have little trouble concluding that the Brannon Letter addresses a matter of public concern.[4] We first determine the "point" of the letter—based mainly on its content, not Myers's motives for writing it. *Rodgers v. Banks*, 344 F.3d 587, 600 (6th Cir. 2003). We then ask whether that point addressed a matter of public concern. *Id.*

*The Letter's Point.* Recall that Myers wrote the letter in support of Brad Kavalunas, a Public Works employee who was fired for alleged workplace misconduct. Myers began the letter by stating that he's known Kavalunas for 24 years, that he vouches for Kavalunas's "personality," "character," and "reputation," and that he was "surprised and saddened" to learn of the alleged misconduct. After giving that preamble, Myers proceeded to the heart of his letter, concluding with these two paragraphs:

> Along the way, I have also witnessed many instances of what I will refer to as "shop or locker room talk" between various employees of the Public Works staff over the years. While the language used was frequently inappropriate and often displayed someone's poor attempt at humor, I can say that I never witnessed any situation that bordered on illegal or hate speech. Instead, what I observed was a

---

[4]Although Myers's complaint did not include a copy of the Brannon Letter, his First Amendment retaliation claim directly referred to the letter as the underlying protected speech, and the defendants attached a copy of the letter as an exhibit to their motion for judgment on the pleadings. We thus may consider the letter's contents at this stage in the proceedings because it is "referred to in [Myers's] complaint and [is] central to [his] claim." *Amini v. Oberlin Coll.*, 259 F.3d 493, 502 (6th Cir. 2001) (citation omitted).

culture where grown men were accustomed to behaving as adolescents, sometimes using crude jokes or inappropriate language during their social interactions. Furthermore, this type of conduct was *pervasive and not limited to just a select few employees.* My lay opinion is that *the workplace conduct alleged in this instance is or was much more systemic.* The use of this type of language was just part of the everyday norm and *had in a sense became the culture at Public Works* over the last two decades.

While this type of conduct should certainly *not be justified*, it seems ill-advised to single out one individual as the "poster child" for the same or similar conduct displayed by many in the same group over the last two plus decades. Given Brad's past performance during his long-tenured career, it seems that *the City would have been better served* to find an alternative to termination. Knowing Brad, the way that I have, it seems to me a demotion, suspension and/or training would have corrected his alleged misconduct and the City would have been able to keep a diligent, trustworthy and dependable individual in their employ.

Simply put, the letter voiced Myers's concern that Kavalunas was unfairly fired for misconduct that the City otherwise tolerated. Indeed, Myers directly asserted "that the workplace conduct alleged in this instance"—*i.e.*, the misconduct allegations lodged against Kavalunas—"is or was much more systemic" within Public Works, which made it unfair to single-out Kavalunas for that conduct.

*The Letter Addresses a Matter of Public Concern.* Viewing the letter's point as such, it addresses a matter of public concern for two interrelated reasons. First, the letter complained about an unfair firing. In *Mayhew*, we held that complaining about an employer's failure to follow normal hiring practices involves a matter of public concern, at least where the complaint was "not made *merely* for [the employee's] personal reasons"—*i.e.*, the employee did not speak merely to get the job that was traded away. *Mayhew*, 856 F.3d at 469 (quoting *Handy-Clay*, 695 F.3d at 544); *see also Banks v. Wolfe Cnty. Bd. of Educ.*, 330 F.3d 888, 897 (6th Cir. 2003) (finding that speech addressing "favoritism/nepotism in hiring" involves a matter of public concern). Myers's letter spoke to an analogous idea: that Kavalunas was unfairly fired. We see no material distinction between commenting on an unfair hiring (as in *Mayhew*) and an unfair firing (as here). And Myers obviously was not gunning for Kavalunas's job, so he did not speak for "personal reasons" in the way meant in *Mayhew*, 856 F.3d at 469.

Second, and more importantly, Myers viewed the firing as unfair not simply because Kavalunas is a good worker; instead, it was unfair because the City had previously tolerated similar "actual or potential wrongdoing," *Connick*, 461 U.S. at 148, something the public certainly has an interest in learning about, *see Garcetti*, 547 U.S. at 425 (noting that "[e]xposing governmental inefficiency and *misconduct* is a matter of considerable significance" (emphasis added)); *Hudson v. City of Highland Park*, 943 F.3d 792, 797–98 (6th Cir. 2019) (holding that a firefighter's "complain[ing] about the poor administration of the fire department"—which tolerated other firefighters "watching pornography in communal spaces and engaging in extra-marital affairs at the fire station"—was "surely protected speech"). And the misconduct need not be limited "to illegal acts, for a public concern includes '*any* matter of political, social, or other concern to the community.'" *Mayhew*, 856 F.3d at 469 (quoting *Connick*, 461 U.S. at 146). The letter, by premising its support of Kavalunas on the City's previous tolerance of similar misconduct, thus crossed the line dividing public matters from internal personnel disputes.

The defendants' counterarguments fail to move the needle. They chiefly argue that Myers's point was only to "involve [him]self in the disciplinary matters of another fellow public employee"—an internal personnel dispute, not a matter of public concern. They rely mainly on *Van Compernolle v. City of Zeeland*, 241 F. App'x 244 (6th Cir. 2007), in which a police officer (Van Compernolle) with a history of submitting inaccurate time sheets, was disciplined and eventually fired. *Id.* at 245–47. Van Compernolle, aside from being an officer, also served as union president, a role in which he negotiated benefits for other officers and assisted them in their personnel-grievance proceedings. *Id.* at 245–46, 250. He sued, arguing that his termination was motivated by his union- and grievance-related speech, which he claimed involved matters of public concern. *Id.* at 247. We disagreed, reasoning that his "participation in other officers' grievance procedures was not a matter of public concern" because it "related to employee discipline, which is generally not a matter of public concern." *Id.* at 250.

*Van Compernolle* does not bind us (it's unpublished), and it's distinguishable anyway. The key difference is that Van Compernolle pointed to no details regarding the "purpose, content, or intent" of his grievance-related speech, so he failed to show that it "encompassed more than internal personnel issues." *Id.* Here, by contrast, we know the contents of Myers's

speech (because we have a copy of the Brannon Letter), and the letter's contents show that Myers's point was broader than Van Compernolle's. Myers based his support of Kavalunas on a topic of public import—the City's previous tolerance of similarly objectionable behavior—which distinguishes the Brannon Letter from speech addressing run-of-the-mill employment matters, like Van Compernolle's mere grievance-related speech.[5]  Put differently, like the speech in *Mayhew* and *Hudson*, the Brannon Letter's point addressed something more than "an internal issue that 'only the employees themselves would be concerned about.'"  *Ryan v. Blackwell*, 979 F.3d 519, 526–27 (6th Cir. 2020) (citation omitted).  And, contrary to the defendants' claim, those references to a matter of public concern were not merely "'passing' or 'fleeting,'" *Farhat*, 370 F.3d at 592–93—that the City fired Kavalunas unfairly, given its previous tolerance of similar behavior, was *the* point of the letter.[6]

The defendants next claim that the Brannon Letter is unworthy of constitutional protection merely because Myers sent it privately to Kavalunas's attorney, rather than distributing it publicly.  Not so.  Whether speech addresses "matters of public concern is not premised on the communication of that speech to the public."  *Mayhew*, 856 F.3d at 469 (quoting *Handy-Clay*, 695 F.3d at 544).

Finally, the defendants argue that Myers's references to harassment amounted to merely "an attempt to normalize" the harassing behavior (and thus somehow isn't protected).  That overemphasizes Myers's motives for writing the letter.  Although motive is relevant, it isn't the touchstone; more important to the public-concern issue is Myers's point, as expressed by the

---

[5]For similar reasons, the defendants' reliance on *Bouldrey v. Mich. Dep't of Corr.*, No. 19-1239, 2019 WL 8219512, at *3 (6th Cir. Sept. 4, 2019) (order), is unpersuasive.  There, the plaintiff's email "focused solely on the staff at [the prison] and the impact that their actions had on" the plaintiff and, contrary to his asserted purpose for writing the email, the email itself did not "indicate that he was concerned about state resources being misused or that public money was being wasted." *Id.*

[6]Further, the Brannon Letter did not "advance[] only a private interest" in the way meant in *Farhat*, 370 F.3d at 592–93.  Myers was not advocating solely on Kavalunas's (or even his own) behalf; rather, his letter stated that "the *City* would have been better served" had it not fired Kavalunas, and "a demotion, suspension and/or training would have corrected his alleged misconduct and the City would have been able to keep a diligent, trustworthy and dependable individual in their employ."  In other words, like the plaintiffs in *Mayhew* and *Hudson*, Myers also had the City's best interests (as he saw them) in mind.  *Mayhew*, 856 F.3d at 469; *Hudson*, 943 F.3d at 797.  That is far removed from Farhat's speech, whose letters aired only "his own personal 'beef' with the union and school district" and made only "'passing' references" to matters of public concern.  *Farhat*, 370 F.3d at 593 (citations and footnotes omitted).

letter's content. *E.g.*, *Rodgers*, 344 F.3d at 600; *Banks*, 330 F.3d at 894. And even if that was Myers's point, it matters little: so long as the point addresses a matter of public concern, the viewpoint taken is immaterial. *See, e.g.*, *Bonnell v. Lorenzo*, 241 F.3d 800, 813 (6th Cir. 2001); *cf. Snyder*, 562 U.S. at 454 (finding that protesters' offensive signs at a soldier's funeral addressed matters of public concern).

For these reasons, Myers's letter addresses a matter of public concern.

#### b. Pickering *Balancing*

Public concern aside, the defendants claim alternatively that the Brannon Letter is not protected speech under *Pickering*, because Myers's "interest in speaking on the matter at issue did not outweigh the City's interest in promoting the efficiency of the public services it performs through its employees."

To carry their *Pickering* burden, the defendants must demonstrate that the "potential disruptiveness" of Myers's speech "was enough to outweigh whatever First Amendment value it might have had." *Waters v. Churchill*, 511 U.S. 661, 681 (1994). We engage in a context-specific inquiry, examining "whether the [speech] impairs discipline by superiors or harmony among co-workers, has a detrimental impact on close working relationships for which personal loyalty and confidence are necessary, or impedes the performance of the speaker's duties or interferes with the regular operation of the enterprise." *Rankin v. McPherson*, 483 U.S. 378, 388 (1987).

Further, at the summary-judgment stage, "this court and the Supreme Court have demanded that employers put on evidence" substantiating their *Pickering* interests. *Devlin v. Kalm*, 531 F. App'x 697, 706 (6th Cir. 2013) (citing *Rankin*, 483 U.S. at 389; *City of Elyria*, 502 F.3d at 493). It follows that, at the pleadings stage, employers must put on as strong or stronger evidence to substantiate the same interests. *See id.*; *Meriwether v. Hartop*, 992 F.3d 492, 511 (6th Cir. 2021) (concluding that the employer failed to substantiate its *Pickering* interests at the pleadings stage); *cf. Perry v. McGinnis*, 209 F.3d 597, 607 (6th Cir. 2000) ("In many cases, due to inadequate factual development, the [*Pickering*] balancing test 'cannot be performed on a 12(b)(6) motion.'" (citation omitted)).

The defendants claim the City has overlapping interests in being able to (1) "make disciplinary decisions without backlash and insult from" employees, (2) "make personnel decisions free from ridicule," and (3) "make an important personnel decision . . . without interference from [Myers], a City employee who was employed in a totally separate" department. As for Myers's side of the coin, the defendants bootstrap their public-concern argument, asserting only that the Brannon Letter addressed an internal personnel dispute, so Myers's interests in writing it were limited accordingly. We reject the premise for the reasons stated above. But we can assume, without deciding, that the public had a limited interest in reading the letter, that Myers's interests in writing it were similarly limited, and that the defendants' *Pickering* burden thus should not be "unduly onerous." *Voigt v. Savell*, 70 F.3d 1552, 1560 (9th Cir. 1995); *cf. Lane*, 573 U.S. at 242 (cautioning that "a stronger showing of government interests may be necessary if the employee's speech more substantially involves matters of public concern" (cleaned up)). We can assume as such because the defendants haven't come close to carrying even that minimal burden at this stage.

The defendants' claimed interests to be "free from ridicule" and to "make disciplinary decisions without backlash and insult" are far too sensitive to suffice. *Pickering* does not extend so far by its own terms: the Court was sure to note that, because "free and open debate is vital to informed decision-making by the electorate," "the judgment of" public officials "cannot . . . be taken as conclusive." *Pickering*, 391 U.S. at 571–72. That implies that some criticism should be expected, if not embraced. *See Garcetti*, 547 U.S. at 425 ("[P]ublic employers should, 'as a matter of good judgment,' be 'receptive to constructive criticism offered by their employees.'" (quoting *Connick*, 461 U.S. at 149)). But even if *Pickering* protects such far-reaching interests, the Brannon Letter's vanilla tone can hardly be called ridicule or insult. At worst, it said that Kavalunas's firing was "ill-advised" and that the "City would have been better served to find an alternative to termination." Only an official with skin as thin as rice paper could find that insulting.

And the defendants' claim that the Brannon Letter "interfered" with Kavalunas's termination is specious at best. As noted, Myers sent the letter to Kavalunas's attorney, who provided it to Manager Davis. Myers did not distribute the letter publicly, nor did he circulate it

even among the City's staff.  The defendants point to nothing showing that the letter hindered their disciplining Kavalunas (indeed, Myers wrote the letter only *after* Kavalunas was fired), that the letter impaired harmony among co-workers, or that it had any other detrimental effects.

The defendants' last claim—that the letter was especially intrusive because Myers worked in a separate department—seems to cut both ways.  On one hand, Myers was a quasi-outsider injecting himself into another department's proceedings; on the other hand, there's little to no indication that Myers regularly interacted with Public Works employees, so his interjection could damage their working relationships only so much.  The defendants have not even asserted, for example, that any Public Works employee (other than Kavalunas) learned of the letter.  These unspecific claims of interference are insufficient to deem, on the pleadings and as a matter of law, that Myers's speech is not protected.  *See Meriwether*, 992 F.3d at 511.  And, to the extent that Myers's speech exposed "official misconduct[,] . . . 'the employer's side of the *Pickering* scale is entirely empty.'"  *Buddenberg*, 939 F.3d at 740 (quoting *Lane*, 573 U.S. at 242).

All told, the defendants failed to meet their burden at this stage to win under *Pickering*. Because the Brannon Letter addresses a matter of public concern and survives *Pickering*, Myers engaged in protected speech; the defendants challenge no other element of Myers's First Amendment retaliation claim now, so he plausibly alleged that claim.

### B.  Clearly Established

"We have long recognized that a public employer may not retaliate against an employee for her exercise of constitutionally protected speech."  *Id.* at 741.  Although the context-specific approach used in balancing tests like *Pickering*'s can make determining whether a right was clearly established difficult on the pleadings alone, *Evans-Marshall v. Bd. of Educ.*, 428 F.3d 223, 234–35 (6th Cir. 2005) (Sutton, J., concurring), we have done it before, *see, e.g.*, *id.* at 233; *Buddenberg*, 939 F.3d at 741; *Chappel v. Montgomery Cnty. Fire Prot. Dist. No. 1*, 131 F.3d 564, 580 (6th Cir. 1997) ("All public officials have been charged with knowing that public employees may not be disciplined for engaging in speech on matters of public concern[.]"). Ultimately, whether a speech-retaliation claim is clearly established at the pleadings stage rises and falls with whether the claim was sufficiently alleged.  *See Hudson*, 943 F.3d at 798 ("We

have repeatedly held—we have repeatedly clearly established—that employers may not retaliate against employees based on their protected speech."). Myers has done that, as explained above, so his claim was clearly established.

The defendants' sole counterpoint is just a redux of their earlier one: because the Brannon Letter does not address a matter of public concern, they argue, any alleged constitutional violation was not clearly established. We conclude, however, that the Brannon Letter addressed a matter of public concern, which means Myers's right to pen it without retaliation was clearly established. The defendants are not entitled to qualified immunity at this stage.

## VI. Statutory Immunity

Lastly, the defendants appeal the denial of statutory immunity under Ohio law. As noted, we may consider only "whether immunity was properly denied," not "the underlying merits of the state [law] claims." *Range*, 763 F.3d at 582.

Ohio law provides absolute immunity to employees of political subdivisions. *See* Ohio Rev. Code § 2744.03(A)(6). That comes with exceptions, and Myers invokes only one: he argues that the defendants acted "with malicious purpose, in bad faith, or in a wanton or reckless manner[,]" and thus are not entitled to statutory immunity. *Id.* § 2744.03(A)(6)(b).

Myers need not "affirmatively demonstrate an exception to immunity . . . in his complaint" to succeed. *Myers v. Cincinnati Bd. of Educ.*, 983 F.3d 873, 880 (6th Cir. 2020) (citation omitted). Rather, to reject his argument at the pleadings stage, "we must find that [his complaint] is 'devoid of [allegations] tending to show that the [defendants] acted'" in at least bad faith. *Novak*, 932 F.3d at 437 (second alteration in original) (quoting *Irving v. Austin*, 741 N.E.2d 931, 934 (Ohio Ct. App. 2000)). And an action taken "with a 'dishonest purpose' constitut[es] bad faith" under Ohio law. *Id.* (quoting *Cook v. Hubbard Exempted Vill. Bd. of Educ.*, 688 N.E.2d 1058, 1061 (Ohio Ct. App. 1996)).

Myers alleged enough to clear this low bar. Among other things, Myers alleged that the defendants made false statements about him to the press, intentionally interfered with his relationship with the FBI, lied about previously instructing him not to interfere with the

disciplinary proceedings of other employees, and lied about formally investigating his allegations against Lavigne and that those allegations were reviewed by a prosecutor.  Further, Chief Brown assigned Lavigne to investigate Myers—even *after* Myers sought whistleblower protection against Lavigne.  That alone left the fox guarding the henhouse.

Taken together, these allegations plausibly show that the defendants acted "with a 'dishonest purpose'" and thus in bad faith under Ohio law.  *Id.* (citation omitted).  Therefore, they are not entitled to statutory immunity at this stage.

## VII.  Conclusion

We affirm the district court's denial of qualified and statutory immunity.