RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 19a0247p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

───────────────

REBECCA BUDDENBERG,

        *Plaintiff-Appellee*,

    *v.*

ROBERT WEISDACK, et al.,

        *Defendants*,

JAMES BUDZIK,

        *Defendant-Appellant*.

No. 18-3674

───────────────

Appeal from the United States District Court
for the Northern District of Ohio at Cleveland.
No. 1:18-cv-00522—Dan A. Polster, District Judge.

Decided and Filed: September 20, 2019

Before: MERRITT, MOORE, and WHITE, Circuit Judges.

───────────────

## COUNSEL

───────────────

**ON BRIEF:** Monica A. Sansalone, Timothy T. Brick, GALLAGHER SHARP LLP, Cleveland, Ohio, for Appellant. Subodh Chandra, Donald P. Screen, Sandhya Gupta, Patrick Kabat, THE CHANDRA LAW FIRM LLC, Cleveland, Ohio, for Appellee.

───────────────

## OPINION

───────────────

HELENE N. WHITE, Circuit Judge. In this interlocutory appeal, Defendant-Appellant James Budzik seeks reversal of the district court's denial of his motion to dismiss based on qualified immunity. Plaintiff-Appellee Rebecca Buddenberg, formerly the fiscal coordinator for the Geauga County, Ohio, Health District, alleges that she was retaliated against by her

supervisor for reporting ethical violations she observed. Budzik served as outside legal counsel for the Health District during the relevant time period, and allegedly facilitated and contributed to the acts of retaliation. Accepting as true the factual allegations in Buddenberg's complaint, she has plausibly alleged violations of her clearly established First Amendment rights. We therefore AFFIRM.

## I.

Rebecca Buddenberg began working at the Geauga County Health District on February 2, 2015. (Second Amended Complaint, R. 31, PID 366 ¶ 11.) In her role as fiscal coordinator, Buddenberg was responsible for certain aspects of the Health District's fiscal management, including processing payroll and accounts payable, preparing fiscal reports, and contributing to the department budget process. (*Id*. ¶ 12.) Buddenberg also performed various human-resource functions, including "maintaining personnel records, overseeing FMLA processes, and acting as the liaison for employee-benefits coordination and injury-reporting between the department and the County Commissioners." (*Id*. ¶ 13.) Her duties did not include reporting internal ethical violations or allegations of discrimination to the Board of Health. (*Id*. ¶ 14.) Defendant Robert Weisdack, Health Commissioner of Geauga County, was Buddenberg's immediate supervisor until roughly April 2016, when Dan Mix became her supervisor. (*Id*. ¶ 15.) Buddenberg then reported to Mix, who reported directly to Weisdack. (*Id*. ¶ 16.)

Early in her tenure, Buddenberg received positive performance reviews from both Weisdack and Mix. Four months after she started, Weisdack gave Buddenberg a glowing review: "I consider Rebecca a professional-minded person"; "Rebecca shows she [is] very ethical"; "Rebecca's attitude is great and has a lot of motivation"; "Rebecca is very genuine in her desire to do more and has great initiative." (*Id*. at PID 367 ¶ 17.) Mix gave Buddenberg a similarly positive review the next year. (*Id*. ¶ 19.)

Beginning in fall 2016, Buddenberg became aware of several possible ethical violations by Weisdack. Buddenberg learned that the Health District had obtained a state grant for tire removal, and, "in the absence of competitive bids, Mr. Weisdack, along with two Health District sanitarian workers, themselves began to undertake the work." (*Id*. at PID 96 ¶ 21.) Buddenberg

was concerned that Weisdack's independent work represented a conflict of interest, as he "was holding meetings during the day about the evening work activities . . . all without seeking Board approval for any contracts." (*Id*. at PID 368–69 ¶ 23.) Buddenberg and Mix informed Weisdack that his work as an independent contractor would require approval from other local officials, but Weisdack ignored them. (*Id*. ¶ 21–22.)

Around the same time, Buddenberg approached Weisdack about an apparently sex-based pay disparity between two employees within the Health District. (*Id*. at PID 369 ¶ 24.) When she broached the issue with him, Weisdack "disparaged [Buddenberg], telling her that she wasn't a lawyer, that he knew what he could do, and that he had already forgotten more that morning than she could ever learn in a lifetime." (*Id*. ¶ 25.)

Buddenberg then reported Weisdack's potential conflict of interest and the disparate-pay issue to the Board of Health at a meeting on October 24, 2016. She also voiced other concerns about unethical conduct by Weisdack, such as accepting gifts from contractors to whom the Health District issued permits, ignoring Buddenberg's suggestion to install GPS units in agency vehicles to ensure proper use of department resources, failing to enforce attendance and break policies, failing to honor the reference-check policy for new hires, and disregarding the recommendations of the employees' health-and-safety committee. (*Id*. ¶ 26.)

Within forty-eight hours of her report to the Board of Health, Weisdack instructed Mix to change Buddenberg's work schedule. (*Id*. at PID 372 ¶ 33.) Buddenberg had always maintained a flexible schedule that allowed her to take college classes and help take care of her grandson. (*Id*. ¶ 33.) As a result of Weisdack's order, Buddenberg was forced to quit school and "became limited in her ability to take care of her grandson." (*Id*.) Mix believed that Weisdack's decision to change Buddenberg's schedule was in retaliation for Buddenberg's report; he texted Buddenberg, "he was mad at you for going to [the] board . . . He told me to get rid of you." (*Id*. ¶ 36.) Two other employees continued to enjoy a flexible schedule, suggesting that Buddenberg was targeted by Weisdack. (*Id*. ¶ 35.) Mix also noted a change in Weisdack's behavior after the October 24, 2016 meeting. In a statement to the board, Mix wrote, "He became dictator-like in his dealings with staff. Since that date Bob has spent most of his energy intimidating staff members, instilling a[] sense of fear, and aligning staff members against one another." (*Id*. ¶ 39.)

Buddenberg continued to report Weisdack's conduct to the Board. From October 31, 2016 to February 1, 2017, Buddenberg wrote multiple emails to several members of the Board of Health and to the Board's attorney in which she detailed Weisdack's ongoing acts of retaliation. (*Id*. at PID 374–376.) Despite her reports, the Board failed to intervene. Indeed, on November 29, 2016, the Board renewed Weisdack's contract. (*Id*. at PID 377 ¶ 51.) In January 2017, Mix was forced to resign. (*Id*. at PID 380–81 ¶ 62.) On February 15, 2017, having exhausted internal channels of communication, Buddenberg filed a charge of retaliation with the Equal Employment Opportunity Commission (EEOC). (*Id*. at PID 381 ¶ 67.)

Four days after receiving notice of Buddenberg's EEOC filing, Weisdack issued a "Notice of Proposed Disciplinary Action" (Notice) against Buddenberg. (*Id*. at PID 383 ¶ 72.) Weisdack drafted the Notice with the assistance of attorney James Budzik. (*Id*. at PID 384 ¶ 73.) The Notice alleged that Buddenberg was "rude, unprofessional, and disrespectful"; that she "willfully demean[ed] and verbally abus[ed] the Health commissioner"; that she "ma[de] a false claim in order to obtain a benefit"; that she defied a directive from Weisdack not to transfer "contaminated" furniture from the Maintenance Department to the Health Department; that she incorrectly stored documents in her office; that she failed to complete payroll assignments on time; and that she shredded documents without authorization. (*Id*. at PID 383–84 ¶ 72.) According to Buddenberg's complaint, the allegations "skewed facts," were "flat-out lies," or were "downright bizarre and obviously pretextual." (*Id*. at PID 386 ¶ 81–83.) Also, the Notice "involved conduct for which others were not disciplined." (*Id*.)

At Buddenberg's disciplinary hearing on March 3, 2017, "Mr. Budzik played the leading role in grilling Ms. Buddenberg." (*Id*. at PID 388 ¶ 87.) Budzik was "aggressive and unfair" during the hearing, "aggressively cut[ting] her off when she tried to answer" and "gaslighting" her. (*Id*. at PID 390 ¶ 91.) Although Buddenberg refuted the charges and provided documentation to explain her position, Budzik was "condescending" and "intimidating." (*Id*. ¶ 91–92.) At the close of the two-hour hearing, Budzik offered to settle the disciplinary charges if Buddenberg would accept a demotion and a salary reduction of nearly $1,000 per month, and drop all her retaliation claims, including her EEOC charge. (*Id*. at 391 ¶94.) Buddenberg asked to have a witness present during this interaction, but Budzik refused. (*Id*.)

Four days later, at a meeting of the Board of Health, Buddenberg asked to make a statement about the disciplinary hearing directly to the Board, but Budzik "stated she could do so only if she agreed to discuss settlement." (*Id*.) Buddenberg declined. Budzik then recommended that the Board take disciplinary action against her. On March 16, 2017, the Health District issued an order sustaining "nearly all of the bogus allegations" in the Notice, suspending Buddenberg for three days without pay, demoting her to a clerical position, and substantially reducing her pay. (*Id*. at 392–93 ¶ 99–100.) Budzik and Weisdack drafted the order. (*Id*. at 393 ¶ 101.)

Buddenberg continued to work under Weisdack for almost two months, but found the work environment intolerable. She resigned on May 27, 2017. (*Id*. at PID 397 ¶ 128.)

Buddenberg filed her complaint in the Northern District of Ohio, naming Weisdack, the Geauga County Health District, several members of the Board of Health, and Budzik as defendants. (R. 1, PID 1.) She filed an amended complaint (R. 3, PID 90), and a second amended complaint. (R. 31, PID 363.) Buddenberg asserted claims of retaliation under Title VII, 42 U.S.C. § 2000 *et seq*., retaliation under the Fair Labor Standards Act, 29 U.S.C. § 215(a)(3), First Amendment retaliation under 42 U.S.C. § 1983, and various state-law causes of action.

Budzik filed a motion to dismiss. (R. 14, PID 156.) As relevant here, Budzik argued that he was entitled to qualified immunity because Buddenberg's complaint failed to allege facts establishing a violation of a clearly established First Amendment right. (*Id*. at PID 170–74.) Budzik argued that Buddenberg's internal complaints were within the scope of her official duties, and thus did not constitute protected speech. (*Id*. at PID 172.) Budzik further asserted that Buddenberg's allegations did not show that Budzik was "plainly incompetent in representing the Health District." (*Id*. at PID 174.)

The district court denied Budzik's motion, stating that "the determination of whether Budzik is entitled to qualified immunity is premature and cannot be determined at this stage in the litigation." (R. 38, PID 483.) The district court noted, however, that "Budzik may raise this defense if he develops a factual record to support it." (*Id*.)

**II.**

We generally have jurisdiction only over "final decisions of the district courts." 28 U.S.C. § 1291. However, "a district court's order rejecting qualified immunity at the motion-to-dismiss stage of a proceeding is a 'final decision' within the meaning of § 1291." *Courtright v. City of Battle Creek*, 839 F.3d 513, 517 (6th Cir. 2016) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 671 (2009)). We therefore have jurisdiction over Budzik's appeal.

"When a defendant appeals the denial of a motion to dismiss based on qualified immunity, we review de novo whether the complaint alleges [a] violation of a clearly established constitutional right." *Id.* (quoting *Heyne v. Metro. Nashville Pub. Sch.*, 655 F.3d 556, 562 (6th Cir. 2011)). In reviewing Budzik's motion to dismiss, the complaint is viewed in the light most favorable to Buddenberg, the allegations in the complaint are accepted as true, and all reasonable inferences are drawn in Buddenberg's favor. *See Gavitt v. Born*, 835 F.3d 623, 639–40 (6th Cir. 2016). Legal conclusions couched as factual allegations need not be accepted as true. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

To survive a motion to dismiss, a plaintiff must allege facts that "plausibly mak[e] out a claim that the defendant's conduct violated a constitutional right that was clearly established law at the time, such that a reasonable officer would have known that his conduct violated that right." *Johnson v. Moseley*, 790 F.3d 649, 653 (6th Cir. 2015). There are two steps to our qualified-immunity inquiry. We determine whether the facts alleged make out a violation of a constitutional right, and we ask whether the right at issue was clearly established when the event occurred so that a reasonable officer would have known that his conduct violated it. *Courtright*, 839 F.3d at 518 (quoting *Martin v. City of Broadview Heights*, 712 F.3d 951, 957 (6th Cir. 2013)).

We have cautioned that "it is generally inappropriate for a district court to grant a 12(b)(6) motion to dismiss on the basis of qualified immunity." *Wesley v. Campbell*, 779 F.3d 421, 433 (6th Cir. 2015). "Although an officer's entitlement to qualified immunity is a threshold question to be resolved at the earliest possible point, that point is usually summary judgment and not dismissal under Rule 12." *Id.* at 433–34 (internal citation and quotation marks omitted).

**III.**

To establish a prima facie case of First Amendment retaliation, Buddenberg must show three elements: first, that she engaged in constitutionally protected speech or conduct; second, that Budzik took an adverse action against her that would deter a person of ordinary firmness from continuing to engage in that speech; and third, that a causal connection exists between the protected speech and the adverse employment action. *Benison v. Ross*, 765 F.3d 649, 658 (6th Cir. 2014).

A.        Constitutionally Protected Speech

We engage in a three-step inquiry to determine whether speech by a public employee is protected. *Mayhew v. Town of Smyrna*, 856 F.3d 456, 462 (6th Cir. 2017). First, we ascertain whether the speech addressed a matter of public concern. *Id*. (citing *Connick v. Myers*, 461 U.S. 138, 143 (1983)). Second, we determine whether the employee spoke as a private citizen or as an employee pursuant to her official duties. *Id*. (citing *Garcetti v. Ceballos*, 547 U.S. 410, 421 (2006)). Third, we balance the interests of the parties and determine if the employee's speech interest outweighs "the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." *Id*. (quoting *Pickering v. Bd. of Educ*., 391 U.S. 563, 568 (1968)).

"Speech involves matters of public concern when it can be fairly considered as relating to any matter of political, social, or other concern to the community, or when it is a subject of legitimate news interest; that is, a subject of general interest and of value and concern to the public." *Lane v. Franks*, 573 U.S. 228, 241 (2014) (citation and internal quotation marks omitted). Buddenberg's complaint alleges that she reported a conflict of interest by her supervisor, sex-based pay disparities within the Health District, and several other instances of maladministration, to authorities both within and outside of her chain of command. We have found that speech addresses a matter of public concern when it alleges the misuse of public funds, *Chappel v. Montgomery Cty. Fire Protection Dist. No. 1*, 131 F.3d 564, 576–77 (6th Cir. 1997), or discrimination, *Hughes v. Region VII Area Agency on Aging*, 542 F.3d 169, 182 (6th Cir. 2008). Allegations of public corruption "are exactly the type of statements that demand

strong First Amendment protections." *Mayhew*, 856 F.3d at 468 (quoting *Handy-Clay v. City of Memphis*, 695 F.3d 531, 543 (6th Cir. 2012) (collecting cases)). Accordingly, accepting Buddenberg's allegations as true, her speech is constitutionally protected.

The second element of the inquiry asks whether the employee spoke as a private citizen or as a public employee. In *Garcetti*, the Supreme Court held that "when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." 547 U.S. at 421. The Supreme Court later clarified that "[t]he critical question under *Garcetti* is whether the speech at issue is itself ordinarily within the scope of an employee's duties, not whether it merely concerns those duties." *Lane*, 573 U.S. at 240.

Buddenberg's speech was not within her ordinary job responsibilities. As fiscal coordinator for the Geauga County Health District, Buddenberg processed biweekly payroll, prepared monthly fiscal reports to the Board, processed accounts payable, and assisted with budget processes. Buddenberg also performed some human-resource functions. However, the complaint makes clear that Buddenberg's ordinary duties did not include reporting employee misconduct to the Board, thus distinguishing this case from those in which the plaintiff's job functions included overseeing department operations and "report[ing] any appropriate situations and accidents immediately to management." *See, e.g.*, *Mayhew*, 856 F.3d at 465. Further, Buddenberg went outside the chain of command by bringing her complaints to the Board. Speech outside the chain of command is less likely to be within an employee's ordinary job responsibilities. *See Handy-Clay*, 695 F.3d at 542–43.

The third step of the inquiry asks whether "the relevant government entity had an adequate justification for treating the employee differently from any other member of the general public" based on the government's needs as an employer. *Garcetti*, 547 U.S. at 418 (discussing *Pickering*, 391 U.S. at 568). However, as the Supreme Court has explained, in cases involving allegations of official misconduct and public corruption, "the employer's side of the *Pickering* scale is entirely empty." *Lane*, 573 U.S. at 242.

Accordingly, Buddenberg's allegations establish that that her speech was protected by the First Amendment.

B.      Adverse Action

Next we must evaluate whether Buddenberg has sufficiently alleged that an adverse action was taken against her that "would chill or silence a person of ordinary firmness from future First Amendment activities." *Dye v. Office of the Racing Comm'n*, 702 F.3d 286, 303 (6th Cir. 2012) (citation omitted). We have previously noted that examples of adverse actions "include discharge, demotions, refusal to hire, nonrenewal of contracts, and failure to promote." *Thaddeus-X v. Blatter*, 175 F.3d 378, 396 (6th Cir. 1999) (en banc) (citation omitted). Constructive discharge may also constitute an adverse action for First Amendment purposes. *See Savage v. Gee*, 665 F.3d 732, 739 (6th Cir. 2012).

Buddenberg has sufficiently alleged an adverse action. She alleges that after she filed her charge with the EEOC, Budzik and Weisdack drafted the Notice of Proposed Disciplinary Action against her. Buddenberg further alleges that this Notice contained multiple statements of fact that Budzik and Weisdack knew were either untrue or purposefully distorted. During the subsequent hearing on the Notice, Budzik aggressively interrogated Buddenberg on these charges, despite knowing that they were baseless. After the hearing, Budzik attempted to intimidate Buddenberg into accepting a settlement in which she would abandon her retaliation charges, be demoted, and receive significantly less pay. Budzik allegedly refused to allow Buddenberg to have a witness present during this meeting. (R. 31, PID 391 ¶ 94.) When Buddenberg declined Budzik's settlement offer, Weisdack and Budzik presented bogus disciplinary charges to the Board, which approved them. Buddenberg was suspended for three days, demoted to a clerical position, and her pay was slashed nearly in half. (*Id.* at PID 393 ¶ 100.) Buddenberg "suffered from depression" as well as "sleeplessness, nausea, and high blood pressure" as a result. (*Id.* at PID 397 ¶ 127.) Finally, the conditions at the workplace "became so intolerable that Ms. Buddenberg was forced to resign." (*Id.* ¶ 128.) These allegations establish the requisite adverse action. *See Dye*, 702 F.3d at 303 (demotion is an adverse action); *Clay v. United Parcel Serv., Inc.*, 501 F.3d 695, 710 n.6 (6th Cir. 2007) (deprivation of increased compensation resulting from a failure to train is an adverse action).

C.    Causation

To determine whether a causal connection existed between the protected conduct and the adverse action, we consider "whether the alleged adverse action 'was taken at least in part because of the exercise of the protected conduct.'" *Holzemer v. City of Memphis*, 621 F.3d 512, 525 (6th Cir. 2010) (quoting *Siggers-El v. Barlow*, 412 F.3d 693, 699 (6th Cir. 2005)). Buddenberg must demonstrate that her speech was "a substantial or motivating factor in the employer's decision to take the adverse employment action against her." *Handy-Clay*, 695 F.3d at 545 (quotation and alteration omitted). We also note that "[a] defendant's motivation for taking action against the plaintiff is usually a matter best suited for the jury." *Id.* (quoting *Paige v. Coyner*, 614 F.3d 273, 282 (6th Cir. 2010)).

The chronology of events alleged in Buddenberg's complaint supports an inference of causation. Temporal proximity between the protected activity and the adverse action can support a causal connection. *See Mickey v. Zeidler Tool & Die Co.*, 516 F.3d 516, 525 (6th Cir. 2008). Weisdack, with Budzik's assistance, issued Buddenberg's Notice of Proposed Disciplinary Action four days after receiving notice of Buddenberg's EEOC charge. The "sham" hearing took place three days after that. Budzik appeared before the Board and recommended that the Board take disciplinary action against Buddenberg a mere eleven days after receiving notice of Buddenberg's EEOC charge. Given the rapid sequence of events, Buddenberg's allegations support an inference that her protected speech caused her discipline. *See, e.g.*, *Dye*, 702 F.3d at 306 ("A lapse of two months . . . is sufficient to show a causal connection").

**IV.**

Because Buddenberg has alleged sufficient facts to support her claim that she engaged in constitutionally protected conduct that motivated the defendants to engage in an adverse action against her, she has satisfied the first prong of the qualified-immunity inquiry. That leaves the question whether the right was clearly established—whether a reasonable official in Budzik's position would have been aware of the violation. Budzik concedes for the purposes of this appeal that he is a state actor. (Reply Br. at 3.)

We have long recognized that a public employer may not retaliate against an employee for her exercise of constitutionally protected speech. *See, e.g.*, *See v. City of Elyria*, 502 F.3d 484, 495 (6th Cir. 2007) ("a public employee's right to speak on matters of public concern without facing improper government retaliation [is] settled"); *Chappel*, 131 F.3d at 580 ("All public officials have been charged with knowing that public employees may not be disciplined for engaging in speech on matters of public concern. . . ."). Buddenberg's right to report public corruption, unethical conduct, and sex-based discrimination within her workplace was clearly established.

Budzik is therefore not entitled to qualified immunity at this phase of the litigation.

## V.

For the reasons stated above, we AFFIRM.