RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 25a0302p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

───────────────

LINDA DEVOOGHT,

*Plaintiff-Appellee*,

*v.*

CITY OF WARREN, MICHIGAN; WILLIAM DWYER,

*Defendants-Appellants*.

No. 24-2028

───────────────

Appeal from the United States District Court for the Eastern District of Michigan at Ann Arbor.
No. 5:20-cv-13168—David R. Grand, District Judge.

Argued: October 22, 2025

Decided and Filed: November 5, 2025

Before: GRIFFIN, THAPAR, and MATHIS, Circuit Judges.

───────────────

## COUNSEL

───────────────

**ARGUED:** Raechel M. Badalamenti, KIRK, HUTH, LANGE & BADALAMENTI, PLC, Clinton Township, Michigan, for Appellants. Kevin M. Carlson, PITT, MCGEHEE, PALMER, BONANNI & RIVERS, P.C., Royal Oak, Michigan, for Appellee. **ON BRIEF:** Raechel M. Badalamenti, Elizabeth P. Morris, Chad L. Riddle, KIRK, HUTH, LANGE & BADALAMENTI, PLC, Clinton Township, Michigan, for Appellants. Kevin M. Carlson, Robin B. Wagner, PITT, MCGEHEE, PALMER, BONANNI & RIVERS, P.C., Royal Oak, Michigan, for Appellee.

───────────────

## OPINION

───────────────

THAPAR, Circuit Judge. Police dispatcher Linda DeVooght sued her employer for gender discrimination. Just eleven days later, she became the subject of an Internal Affairs

investigation, which ended in her termination.  So she sued again—this time, alleging the City of Warren and its Police Commissioner unlawfully retaliated against her for suing them.  The district court denied Commissioner William Dwyer qualified immunity.  This interlocutory appeal followed.

Federal courts can hear interlocutory appeals only in a narrow set of circumstances.  Usually, that jurisdiction is limited to purely legal questions.  Isolating the purely legal questions in this appeal, we affirm the district court's denial of qualified immunity.  Appellants also raise factual arguments about causation, which we dismiss for lack of appellate jurisdiction at this interlocutory stage.

I.

A.

Linda DeVooght began working as a dispatcher for the City of Warren, Michigan Police Department (the Department) in 1999.  Dispatchers are civilian employees who receive, transmit, and refer calls to officers.

As a formal part of the job, the Department required dispatchers to search arrestees "as necessary."  R. 32-10, Pg. ID 1195.  For female dispatchers, that meant conducting pat-down and strip searches of female arrestees taken into custody when no female officers were available.  In practice, female dispatchers like DeVooght performed searches often, even when female officers were on duty.  These searches exposed dispatchers to "contagious diseases, bodily fluids, fleas, lice," and "extremely aggressive behavior and abuse from arrestees."  R. 1, Pg. ID 7.  The Department had no similar policy for male dispatchers.

DeVooght and other female dispatchers had long complained about the Department's search policy.  In 2020, they became especially concerned about contracting COVID-19 when searching arrestees.  So DeVooght and five other female dispatchers sued the City of Warren for sex discrimination in the Eastern District of Michigan.  The merits of that case aren't relevant here—only what followed.

Eleven days after DeVooght sued, the Department opened an Internal Affairs investigation into her. The investigation began after a male dispatcher complained to a police captain that he had overheard DeVooght asking another female dispatcher whether she planned to join the lawsuit. The next day, DeVooght reported dispatcher Mariah Alasadi for publicly calling her a profanity after DeVooght had reprimanded her for chronic tardiness. Alasadi believed DeVooght reprimanded her only because Alasadi refused to join the lawsuit. Normally, the Department resolved such personnel disputes through the chain of command. But instead, an Internal Affairs lieutenant opened a formal investigation. On DeVooght's telling, the investigation was based on "personal hostility . . . about the lawsuit." Appellee's Br. at 9. She believed the Department's real motivations were to punish her for suing and to dissuade other dispatchers from joining as plaintiffs.

The investigation quickly escalated. It lasted for over two months. Twenty-three dispatch employees were interviewed, some multiple times. One dispatcher who had originally joined the lawsuit admitted in her interview that she accessed a case report about an arrestee assaulting her using the Department's case-management system called CLEMIS. Using CLEMIS for personal business violated official policy. So investigators requested CLEMIS records associated with searches from the other plaintiffs, including DeVooght.

Ultimately, Internal Affairs concluded DeVooght hadn't retaliated against anyone for refusing to join the lawsuit. While DeVooght may have contributed to a hostile work environment among the dispatchers, there were other, pre-existing tensions in the group—a famously "temperamental" division. R. 32-12, Pg. ID 1271. But the investigation uncovered that DeVooght used CLEMIS for personal reasons in violation of Department policies, so the Department disciplined her for that infraction. She was first placed on paid administrative leave, then terminated altogether. Represented by her union, DeVooght appealed her termination. She settled with the Department, which reinstated her with a demotion from dispatch supervisor to dispatcher (and a corresponding pay cut), an unpaid suspension, and two years of ineligibility for promotion.

B.

In response, DeVooght initiated a second lawsuit in the Eastern District of Michigan. She again brought claims under 42 U.S.C. § 1983 and Michigan's Elliott-Larsen Civil Rights Act (ELCRA). *See* Mich. Comp. Laws § 37.2101 *et seq*. But this time, she alleged a First Amendment violation: Dwyer and the City retaliated against her for engaging in protected speech by filing her gender-discrimination lawsuit. Similarly, DeVooght's ELCRA claim alleged intimidation and threats for exercising rights protected by the Act. She sued the City of Warren and its Police Commissioner, William Dwyer, in his individual capacity.

Dwyer and the City moved for summary judgment. The district court granted their motion in part, ruling that DeVooght couldn't pursue her First Amendment claims against Dwyer because he lacked authority to make policy on the City's behalf. *See Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978); *Pembaur v. City of Cincinnati*, 475 U.S. 469, 481–83 (1986). But the district court analyzed those individual-capacity claims against Dwyer using *Monell*'s framework for municipal liability. And it didn't address whether *Monell* permitted DeVooght's claims against the City. As the case proceeded towards trial, the district court's treatment of these two issues confused the parties. So DeVooght moved for reconsideration, seeking to clarify that she sued Dwyer in his individual capacity and that she sought to establish municipal liability against the City. The district court permitted both parties to submit new dispositive motions and held a hearing to resolve them.

At the hearing, the district court noted that the Defendants' first summary-judgment motion erroneously applied *Monell* to the claims against Dwyer. The district court's ruling on that previous motion compounded the error by dismissing the claims on that basis. So, in effect, DeVooght's individual-capacity retaliation claim against Dwyer "was never really ruled on." R. 116, Pg. ID 4181. The Defendants' second motion for summary judgment repeated the mistake by treating the claim against Dwyer as a municipal-liability claim governed by *Monell*. Dwyer also raised a qualified-immunity defense to the individual-capacity claim against him.

The district court granted summary judgment to the City on DeVooght's retaliation claim because she failed to establish municipal liability. But it denied summary judgment on the

individual-capacity claim against Dwyer. The district court reasoned that the timing, scope, and other circumstances of DeVooght's investigation and discipline left a genuine issue of material fact about causation.

II.

A.

Ordinarily, we can review only final judgments of the district courts. One exception to this rule is that we may review a district court's denial of qualified immunity on an interlocutory basis so long as it "turns on an issue of law." *Mitchell v. Forsyth*, 472 U.S. 511, 530 (1985). But we lack jurisdiction to review orders denying qualified immunity if genuine factual issues remain. *Johnson v. Jones*, 515 U.S. 304, 319–20 (1995).

In an interlocutory appeal that raises multiple issues, like this one, we must "separate an appellant's reviewable challenges from its unreviewable" ones. *DiLuzio v. Village of Yorkville*, 796 F.3d 604, 610 (6th Cir. 2015). We review the legal questions properly before us while "overlook[ing]" any attempts to dispute the facts. *Bell v. City of Southfield*, 37 F.4th 362, 365 (6th Cir. 2022) (quotation omitted).

B.

As a threshold matter, Dwyer argues that DeVooght abandoned or forfeited her individual-capacity claim against him by failing to move for reconsideration of the first summary-judgment order. Appellants' Br. at 25–26. But DeVooght was not obligated to move for reconsideration. She could have, but she could also wait to appeal. And that's exactly what she planned to do. Indeed, in pretrial filings, she said that she intended to "appeal [the district court's] flawed decision." R. 89, Pg. ID 3384 n.1, 3387 n.2. Fortunately for DeVooght, the district court beat her to it and remedied its own legal error. That's hardly abandonment.

III.

On appeal, Dwyer contends that he didn't violate DeVooght's clearly established First Amendment rights, so he should receive qualified immunity. Qualified immunity protects government officials unless they "(1) violated a constitutional right that was (2) clearly

established." *VanPelt v. City of Detroit*, 70 F.4th 338, 340 (6th Cir. 2023). We can resolve a case on either prong. *Pearson v. Callahan*, 555 U.S. 223, 236 (2009). At the first prong, we isolate the legal questions relevant to DeVooght's retaliation claim and ignore any attempt to dispute her account of the facts. *Bunkley v. City of Detroit*, 902 F.3d 552, 560 (6th Cir. 2018). And the second prong—whether the right is clearly established—is a purely legal question. *DiLuzio*, 796 F.3d at 609. We review the denial of qualified immunity at summary judgment de novo. *Ramsey v. Rivard*, 110 F.4th 860, 865 (6th Cir. 2024).

## A.

We start with the first prong of the qualified-immunity test. DeVooght's First Amendment retaliation claim required her to show that "(1) she engaged in constitutionally protected speech, (2) she suffered an adverse action likely to chill a person of ordinary firmness from continuing to engage in protected speech, and (3) the protected speech was a substantial or motivating factor for the adverse action." *Kirkland v. City of Maryville*, 54 F.4th 901, 907 (6th Cir. 2022). Neither party disputes the first element, so we begin with the second.

### 1.

#### a.

Dwyer presents both legal and factual questions about whether an adverse action occurred. Of course, we can review purely legal questions on interlocutory appeal. *Moldowan v. City of Warren*, 578 F.3d 351, 369 (6th Cir. 2009). Further, once a party raises legal questions that fall within our jurisdiction, we can "identify the facts that the record would allow a reasonable jury to find." *DeCrane v. Eckart*, 12 F.4th 586, 603 (6th Cir. 2021). And we can reject a "factual determination" that is "blatantly contradicted by the record, so that no reasonable jury could believe it." *Ramsey*, 110 F.4th at 866 (quotation omitted). Dwyer argues that record evidence blatantly contradicts the district court's determination that a genuine issue of material fact existed about causation.

When does a record "blatantly contradict" the district court's decision? In *Scott v. Harris*, the Supreme Court reviewed a case just like this one: a denial of qualified immunity at summary judgment on interlocutory appeal. 550 U.S. 372, 376 (2007). After a car chase that

ended in a crash and paralyzed Harris, he sued the officer who caused the crash.  *Id.* at 375.  In response, the officer raised a qualified-immunity defense, which the district court denied at summary judgment because it believed issues of fact remained.  *Id.* at 376.  On interlocutory appeal, the Supreme Court reversed, finding Harris's version of events "so utterly discredited by the record that no reasonable jury could have believed him."  *Id.* at 380.  And the *Scott* Court "expressed no doubts about [its] jurisdiction."  *Plumhoff v. Rickard*, 572 U.S. 765, 773 (2014).  Since then, we have consistently reviewed factual disputes in interlocutory appeals when the district court's factual determination is "blatantly contradicted by the record, so that no reasonable jury could believe it."  *DiLuzio*, 796 F.3d at 609 (quoting *Scott*, 550 U.S. at 380).

This rule makes good sense of the summary-judgment standard.  Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "[T]he mere existence of *some* alleged factual dispute between the parties" isn't enough.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986).  Instead, the adjectives in Rule 56 matter.  *Material* facts "affect the outcome of the suit under the governing law."  *Id.* at 248.  *Genuine* disputes about them exist when the evidence would allow a reasonable jury to rule in favor of the nonmoving party.  *Id.*  Putting all of that together, Rule 56 asks "whether [the evidence] is so one-sided that one party must prevail as a matter of law."  *Id.* at 252.

As every law student learns in Civil Procedure, more evidence is required at summary judgment than at earlier stages of litigation.  To survive a motion to dismiss, a plaintiff must plead sufficient facts to make a "plausible" claim for relief.  *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009).  But at summary judgment, the nonmoving party must "go beyond the pleadings and . . . designate specific facts showing that there is a genuine issue for trial."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986) (cleaned up).  This heightened requirement reflects the lawsuit's progress:  Because the parties have completed discovery, more evidence should be available than at the complaint stage.  So once a moving party has put forth evidence supporting its version of the facts, the nonmoving party "must support its factual positions" with evidence in response, not "mere allegations in the pleadings."  10A *Wright & Miller's Federal Practice & Procedure* § 2727.2 (4th ed. 2016).  No matter what the nonmoving party *says* at summary judgment, "a

complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex Corp.*, 477 U.S. at 323. In nonlegal terms, you can't beat something with nothing.

*Scott* applied this standard in an interlocutory appeal because no matter what Harris said happened, the record told "quite a different story." 550 U.S. at 379. "[N]o reasonable jury could believe" Harris's version, *id.* at 380, so the Court declined to adopt "such visible fiction," *id.* at 381. That's a common-sense reading of Rule 56. Even if Rule 56 commands judges to view the facts in the light most favorable to the nonmoving party, it certainly doesn't require us to put blinders on. *Scott* teaches us that's true even in interlocutory appeals.

Since then, we've followed the Supreme Court's lead in qualified-immunity cases. *See Chappell v. City of Cleveland*, 585 F.3d 901, 906 (6th Cir. 2009). Because Rule 56 "does not require or permit the court to accept mere allegations that are not supported by factual evidence," doing otherwise is a legal error. *Id.*; *see also Bunkley*, 902 F.3d at 559 (describing this as a "legal question").

And in determining whether a "blatant contradiction" exists, we are not limited to video evidence. Of course, given the increasing prevalence of cameras in policing, we've most often applied *Scott* in qualified-immunity cases when video evidence exists. *See Feagin v. Mansfield Police Dep't*, --- F.4th ---, 2025 WL 2621665, at *1–2 (6th Cir. Sep. 11, 2025) (collecting cases). But nothing in *Scott* suggests its reasoning applies only to videos. *See* 550 U.S. at 380 ("blatantly contradicted *by the record*" (emphasis added)); *id.* ("utterly discredited *by the record*" (emphasis added)); *id.* ("the record taken as a whole" (quotation omitted)). Our cases don't limit *Scott* to video evidence, either. *See, e.g.*, *Austin v. Redford Twp. Police Dep't*, 690 F.3d 490, 496 (6th Cir. 2012) ("[A]n appellate court may overrule a district court's determination that a factual dispute exists where evidence in the record establishes that the determination is blatantly and demonstrably false." (quotation omitted)). So we've also applied the test to audio recordings, *Coble v. City of White House*, 634 F.3d 865, 869 (6th Cir. 2011), and medical records, *Booher ex rel. T.W. v. Montavon*, 555 F. App'x 479, 484 (6th Cir. 2014). And we've found blatant contradictions in a record including depositions and documentary evidence, like this one. *Chappell*, 585 F.3d at 912–13.

A contrary rule wouldn't make sense. If appellate courts couldn't consider whether a record contained enough evidence for a reasonable jury to find for the nonmoving party, district courts could utter the magic words "genuine issue of material fact" and bar interlocutory appellate review. That would defeat the benefit of qualified immunity by forcing defendants "to stand trial or face the other burdens of litigation" with no possibility of review. *Mitchell*, 472 U.S. at 526. And it would call into question our own "virtually unflagging obligation" to "decide the cases appropriately before us." *Johnson ex rel. X.M. v. Mount Pleasant Pub. Schs.*, --- F. 4th ---, 2025 WL 2778579, at *3 (6th Cir. Sep. 30, 2025) (quotation omitted).

b.

Dwyer first contests whether DeVooght alleged adverse action as a matter of law. He argues DeVooght's complaint alleged only that Dwyer initiated an internal investigation into her, which isn't an adverse action under our precedent. But DeVooght specifically alleged that Dwyer terminated her, too. That means the complaint pled all the required elements of her claim. *See Johnson v. City of Shelby*, 574 U.S. 10, 11–12 (2014) (per curiam).

Even though internal investigations aren't usually adverse actions by themselves, DeVooght identifies much more than just the opening of an investigation. She was terminated, then reinstated with a host of disciplinary sanctions—a demotion and resulting pay cut, an unpaid suspension, and two years' ineligibility for promotion. These are all adverse actions.[1] *See Handy-Clay v. City of Memphis*, 695 F.3d 531, 545 (6th Cir. 2012) ("The term adverse action has traditionally referred to actions such as discharge, demotions, . . . and failure to promote." (cleaned up)). So Dwyer's legal arguments fail.

Dwyer also argues that he lacked final decision-making authority over DeVooght's discipline. This argument is either irrelevant or unreviewable. On one reading, this is merely a

---

[1]Dwyer emphasizes that DeVooght's final disciplinary measures came after she "voluntarily entered into" a settlement with the City of Warren, accepting a demotion, pay cut, unpaid suspension, and ineligibility for promotion rather than termination. Appellants' Br. at 19. In this case, her agreement via settlement to the adverse actions doesn't make them any less adverse. DeVooght may have picked the lesser of two evils. But who wouldn't, in her position? Agreeing to a set of undisputedly adverse consequences over a worse, undisputedly adverse consequence isn't much of a choice. Both the Hobson's choice and its consequences would deter most "individuals of ordinary firmness" from engaging in protected speech. *Cunningham v. Blackwell*, 41 F.4th 530, 541 (6th Cir. 2022) (quotation omitted).

third, repackaged attempt to analyze the individual-capacity claim under *Monell*. But that argument would fundamentally misunderstand *Monell*. *Monell* confirmed that municipalities and local governments may be liable for constitutional torts, but not subject to *respondeat superior* liability under § 1983 for any tort committed by their employees. 436 U.S. at 691. Instead, municipal liability attaches to actions committed by only those employees "whose edicts or acts may be fairly said to represent official policy." *Id.* at 694. An employee's act can make the entire city liable only if the "official ha[s] final policymaking authority" specifically "with respect to the subject matter in question." *Pembaur*, 475 U.S. at 483.

Whether Dwyer could exert "final decision-making authority regarding DeVooght's employment," Appellants' Br. at 30 n.7, might well matter to her claim against *the City*. That's because the question gets at whether Dwyer's purportedly unlawful acts were so representative of the City's policy or custom as to fairly subject the City to liability. But it's irrelevant to DeVooght's individual-capacity claim.

On another reading, Dwyer argues that his lack of final decision-making authority means he didn't take any actions that would subject him to liability. Certainly, in § 1983 suits, an individual-capacity "defendant's liability must be assessed individually based on his own actions." *Binay v. Bettendorf*, 601 F.3d 640, 650 (6th Cir. 2010). And Dwyer asserts that his involvement in the disciplinary process was no more than "initiating an internal investigation." Appellants' Br. at 32. But DeVooght points to evidence of much greater involvement, including Dwyer's own testimony that he was "the sole decisionmaker" in DeVooght's termination. R. 32-9, Pg. ID 1184. That's a quintessential factual dispute for a jury to resolve and beyond our appellate jurisdiction.

In short, DeVooght alleged legally cognizable adverse actions, and we lack jurisdiction to decide any of the associated factual disputes.

2.

Dwyer also disputes the third element of a First Amendment violation: causation. He insists the Department disciplined DeVooght for "an intervening, legitimate reason" rather than in retaliation for her lawsuit. Appellants' Br. at 1. In First Amendment retaliation cases,

causation is a question of fact. *DeCrane*, 12 F.4th at 602. Factual questions usually fall outside our interlocutory appellate jurisdiction. *See Johnson*, 515 U.S. at 313. And here, *Scott* doesn't save them. The district court viewed the evidence in the light most favorable to DeVooght and found that factual issues remained about causation and pretext, making summary judgment inappropriate. *Scott* permits us to determine whether the record "utterly discredit[s]" that finding. 550 U.S. at 380. It doesn't.

*Johnson* presumptively bars us from considering Dwyer's causation arguments. 515 U.S. at 313. As we've previously said in First Amendment retaliation cases, there's "no doubt that th[e] causation element . . . presents a pure fact question about the reason(s) for the adverse action." *DeCrane*, 12 F.4th at 602. We could surely review "legal arguments about the proper meaning of the First Amendment's causation element," if Dwyer raised any. *Id.* at 603. But he doesn't. Instead, he argues a reasonable jury couldn't find in DeVooght's favor on causation. And that's fatal to our jurisdiction because it's the exact kind of "evidence sufficiency" argument *Johnson* prohibits. 515 U.S. at 313. Applying Supreme Court precedent, "we have repeatedly refused to consider whether a plaintiff presented enough evidence to create a genuine dispute of fact on the causation element of a First Amendment retaliation claim." *DeCrane*, 12 F.4th at 603.

Dwyer can't invoke *Scott* to avoid *Johnson*. Under *Scott*, we ask whether DeVooght's version of events is "blatantly contradicted by the record." 550 U.S. at 380. But if we find any colorable factual dispute, then we lack jurisdiction, because the appeal would raise "only a question of evidence sufficiency." *Johnson*, 515 U.S. at 313 (cleaned up). At summary judgment, DeVooght presented enough specific evidence to create a colorable factual dispute. Her evidence showed that administrators knew about her lawsuit before they began looking into her and escalated to an official Internal Affairs investigation without further inquiry when similar disputes were typically handled at a lower level. Additionally, other dispatch employees said they never felt any pressure from DeVooght and, in fact, supported the lawsuit. Most importantly, Dwyer himself testified that he personally ordered the investigation because of rumors about DeVooght recruiting potential plaintiffs and made the decision to fire DeVooght.

In short, she presented enough specific factual allegations to defeat summary judgment—a far cry from the "visible fiction" in *Scott*. 550 U.S. at 381.

Our factual review is limited to ensuring we have jurisdiction. Once we find a material factual dispute, that jurisdiction disappears. So we must dismiss Dwyer's appeal of the denial of qualified immunity to the extent it turns on causation. *Berryman v. Rieger*, 150 F.3d 561, 564–65 (6th Cir. 1998).

B.

Even when parties show a legal violation, qualified immunity protects government officials unless their claimed right "was clearly established." *VanPelt*, 70 F.4th at 340 (cleaned up). A right is clearly established when "every reasonable official would have understood that what he is doing violates that right." *Reichle v. Howards*, 566 U.S. 658, 664 (2012) (cleaned up). The plaintiff bears the burden of showing the right was clearly established by identifying binding, on-point precedent. *Bell*, 37 F.4th at 367.

DeVooght has carried her burden to identify a clearly established right. We have repeatedly held that a public employee's right to engage in protected speech without retaliation is clearly established for purposes of qualified immunity. *See Buddenberg v. Weisdack*, 939 F.3d 732, 741 (6th Cir. 2019). And "[a]ll public officials have been charged" with knowledge of that right. *Chappel v. Montgomery Cnty. Fire Prot. Dist. No. 1*, 131 F.3d 564, 580 (6th Cir. 1997).

DeVooght's other misconduct doesn't help Dwyer. Our precedent holds that an adverse action motivated *in part* by protected speech violates the First Amendment—even when an employee has other misconduct on the record. *Hoover v. Radabaugh*, 307 F.3d 460, 469 (6th Cir. 2002). Our cases may have concerning implications. For instance, in *Hoover v. Radabaugh*, this court denied qualified immunity when the plaintiff was terminated after physically pushing his supervisor and threatening to kill him. *Id.* at 464. That's because the intervening (and surely legitimate) reasons for discipline didn't change our "clearly established" law: The First Amendment protected Hoover from termination "with the motivation, even in part," of retaliation. *Id.* at 469. *Hoover* binds this panel. So DeVooght has shown a clearly established right.

IV.

Dwyer and the City also ask us to exercise pendent appellate jurisdiction over DeVooght's ELCRA claims against them. This court can exercise pendent appellate jurisdiction over otherwise unappealable claims that are "inextricably intertwined with the issues over which the court has jurisdiction." *Hanover Am. Ins. Co. v. Tattooed Millionaire Ent., LLC*, 38 F.4th 501, 511 (6th Cir. 2022) (cleaned up). Whether to exercise that jurisdiction is a matter of discretion. *Williams v. Maurer*, 9 F.4th 416, 428 (6th Cir. 2021).

Claims "are not inextricably intertwined merely because they overlap in some respects." *Id.* at 429 (cleaned up). Instead, resolution of the issue before us—whether Dwyer receives qualified immunity—must "necessarily resolve" the ELCRA claims against him and the City. *Id.* (quotation omitted). It doesn't. The question of Dwyer's entitlement to immunity as an individual doesn't resolve any of DeVooght's claims against the City. The merits of DeVooght's federal First Amendment claims may provide some insight into the ELCRA claims against Dwyer because both claims involve similar elements. *See El-Khalil v. Oakwood Healthcare, Inc.*, 934 N.W.2d 665, 670–71 (Mich. 2019). But the immunity question doesn't resolve the merits of DeVooght's federal claims, let alone the state ones. So we decline to exercise pendent appellate jurisdiction over any of her state-law claims.

\*          \*          \*

We affirm the district court's denial of qualified immunity. We otherwise dismiss the appeal insofar as it presents issues of fact that we lack appellate jurisdiction to consider.